[Cite as *State v. Harris*, 2024-Ohio-3388.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 2023 CA 0064 |
| QUINN HARRIS | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS:   Appeal from the Richland County Court of
Common Pleas, Case No. 2023-CR-
0381R

JUDGMENT:   Affirmed

DATE OF JUDGMENT ENTRY:   September 3, 2024

APPEARANCES:

For Plaintiff-Appellee

JODIE M. SCHUMACHER
Prosecuting Attorney
Richland County, Ohio

MEGAN HOBART
Assistant Prosecuting Attorney
Richland County, Ohio
38 South Park Street
Mansfield, Ohio 44902

For Defendant-Appellant

CATHERINE MEEHAN
Patituce & Associates, LLC
16855 Foltz Industrial Parkway
Strongsville, Ohio 44149

*King, J.*

**{¶1}** Defendant-appellant Quinn Harris appeals his conviction and sentence entered by the Richland County Court of Common Pleas, on one count of felonious assault, following a jury trial. Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE CASE AND FACTS

**{¶2}** On June 21, 2023, the Richland County Grand Jury indicted Appellant on one count of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; and one count of domestic violence, in violation of R.C. 2919.15(A) and (D)(3), a felony of the fourth degree. Appellant appeared before the trial court for arraignment on June 30, 2023, and entered a plea of not guilty to the Indictment.

**{¶3}** The trial court scheduled the matter for jury trial on September 18, 2023. Upon realizing the report from the DNA expert had not been provided to defense counsel 21 days prior to trial as required by Crim.R. 16, the State requested a continuance. The trial court granted the continuance over Appellant's objections. The jury trial commenced on October 2, 2023.

**{¶4}** City of Ontario Police Department Lieutenant Gregory Ford was working the midnight shift on May 1, 2023, when he dispatched to 34224 Park Avenue, West, Ontario, Richland County, Ohio, in response to a noise complaint. Lieutenant Ford parked his cruiser across the street from the residence, sat stationary for three to four minutes, then left the area when did not see or hear anything. Lieutenant Ford was approximately two or three blocks away when dispatch notified him about a subsequent 9-1-1 call from the same caller. The caller indicated a female in the residence was yelling and it sounded as if someone needed help.

{¶5}   Lieutenant Ford returned to the area.  As he drove past the home, he noticed the silhouette of a female in the upper, right-hand window. He drove further down the road, parked his cruiser, and approached on foot.  As he did, Lieutenant Ford saw lights going off and on "a couple of times, like they're trying to signal somebody."  Trial Transcript, Vol. V, p. 265.  He shone his flashlight towards the window, using the strobe feature, but did not receive a response.  Office Mohn arrived.  Shortly thereafter, a female, who was identified as Kenyona Brooks, exited the residence and approached the officers. Lieutenant Ford immediately observed bruising and swelling on the side of Brooks' face, "like someone had beaten the side of her face very, very badly." Id. at p. 266.  Lieutenant Ford stated blood and saliva were coming from Brooks' mouth as she spoke, and her speech was very garbled.  He testified, based upon his training and experience, the injuries were fresh and "had to have recently occurred, within maybe an hour." Id. at p. 268.  When Lieutenant Ford and Officer Mohn asked Brooks what had happened and who had done this to her, she continually responded, "he's upstairs, he's upstairs." Id. at p. 267. When asked who he was, Brooks answered, "Quinn," (Appellant).

{¶6}   Officer Cooke subsequently arrived at the scene.  Officer Cooke spoke to Brooks, determined she needed medical care, and requested a squad. Lieutenant Ford and Officer Mohn entered the residence and located Appellant, asleep on the couch.  The officers observed a small amount of blood on Appellant's left hand and blood on his shirt. They had a difficult time waking Appellant.  Appellant denied knowing what happened, claiming he had been asleep.  Lieutenant Ford indicated the officers' attempt to speak with Appellant was not constructive, explaining Appellant was not very coherent. He

added Appellant appeared intoxicated, his speech was slurred, and there was a strong odor of alcohol emanating from his person.

{¶7} While EMTs ("emergency medical technicians") tended to Brooks, Lieutenant Ford, Officer Mohn, and Officer Cooke walked through the upper floor of the residence. Inside the bathroom, they observed a large amount of blood spattered on the walls and the shower curtain had been pulled down. Lieutenant Ford testified, "There was blood all throughout that room. It looked like blood that would be cast off from somebody getting hit specifically in that room." *Id.* at p. 285. He added, "There was blood splattered against the wall and had dripped down, like somebody was hit in this room." *Id.* In the living room, the officers observed a pool of blood next to the couch.

{¶8} Upon further questioning, Brooks told the officers Appellant had struck her with his fists and head-butted her. Lieutenant Ford described Brooks as agitated, "very, very unsettled," crying, and emotional throughout his encounter with her. *Id.* at p. 288. The officer added Brooks was having trouble maintaining consciousness and the officers and EMTs feared she would fall down or pass out. Video footage from Lieutenant Ford's body camera, which was played for the jury, corroborated his testimony.

{¶9} Springfield Township Fire Department EMT Richard Metzger was dispatched to 3424 Park Avenue, West, on May 1, 2023, to assist the Ontario Police Department with an assault. Metzger described Brooks' injuries, noting "she had some facial bleeding occurring, some blood coming from her mouth." *Id.* at p. 366. Brooks also "had a lot of facial swelling, some pretty major swelling to the eyes where it was hard for her to see." *Id.* Due to the extent of Brooks' facial injuries, Metzger was concerned she

could have a skull fracture or a brain bleed. Brooks admitted she had two glasses of port wine, but did not appear to be intoxicated.

{¶10} When Metzger asked Brooks what happened, she told him "she went to bed and was breathing too loud, and I don't know if it was her boyfriend or husband just basically attacked her." *Id.* at p. 370. Metzger described Brooks as "moderately distressed" and "visibly upset." *Id.* at pp. 372-373. Metzger transported Brooks to Ohio Health Mansfield although Avita was closer because the extent of her physical injuries was unknown and Ohio Health was better equipped to handle her injuries.

{¶11} Ontario Police Officer Chase Cooke was working the midnight shift on May 1, 2023, when he was dispatched to 3424 Park Ave, Ontario, on a noise complaint. When Officer Cooke arrived at the scene, Lieutenant Ford and Officer Mohn were speaking with the victim, whom Officer Cooke later learned was Brooks. Based upon Brooke's "gruesome facial features," Officer Cooke speculated she had been assaulted. Lieutenant Ford instructed Officer Cooke to speak with Brooks. Brooks had difficulty speaking due to her injuries. When Officer Cooke asked Brooks if Appellant was hitting her that evening, she responded, "I don't normally look like this." Tr. at p. 446. Officer Cooke had Brooks fill out a statement.

{¶12} After speaking with Brooks, Officer Cooke transported Appellant to the police station. Officer Cooke collected Appellant's clothing. He noticed blood stains on his shirt and pants. Officer Cooke's testimony was corroborated by video footage from his body camera, which was played for the jury.

{¶13} Ontario Police Officer Jeremy Mohn was working the midnight shift on May 1, 2023, when he was dispatched to 3424 Park Ave, Ontario. Upon his initial arrival, the

residence was dark. He moved from the front of the residence down the street when Lieutenant Ford turned around and came back. The officers noticed the upstairs lights in the residence flicker off and on. As Officer Mohn and Lieutenant Ford approached the house, they observed a female outside, waving to them with her cell phone. The officers made contact with the female and learned she was Kenyona Brooks. Officer Mohn immediately thought how badly Brooks had been assaulted. Brooks was bleeding from her mouth, her cheeks "were exceptionally swollen" and "[h]er left eye was very, very swollen." Tr., Vol. II at p. 624.

{¶14} Officer Mohn asked Brooks "where he was" and she responded upstairs, asleep on the couch. The officers entered into the house and proceeded to the stairs where they found Appellant sleeping on the couch. Officer Mohn noticed a pool of blood on the floor to the right side of the couch. Officer Mohn and Lieutenant Ford attempted to wake up Appellant. It took the officers several seconds to get Appellant to wake up and to respond to their questions. Officer Mohn described Appellant as "very, very lethargic and very, very intoxicated." Tr., Vol. VII at p. 627. Officer Mohn noticed blood on Appellant's shirt. Appellant was combative and standoffish as the officers spoke with him. Appellant insisted he did not know what had happened, claiming he was asleep the entire time.

{¶15} Officer Mohn described Brooks as very upset and stressed. She was crying and appeared to be in pain. The swelling on Brooks' face started to get worse to the point it was difficult to understand what she was saying. Brooks was also fading out of consciousness and was having a difficult time speaking coherently. When asked what happened, Brooks explained she and Appellant were sitting on the couch and she "must

have * * * breathed wrong" because Appellant started to berate her.  Tr. Vol. VII at p. 647.

Brooks added the assault started in the living room and continued into the bathroom.

Brooks confirmed Appellant was the individual who assaulted her.  Video footage from

Officer Mohn's body camera was played for the jury.

{¶16}  Approximately two months later, Officer Mohn received a copy of an email

Brooks sent to the Prosecutor.   Therein, Brooks implicated Derrick Adkins as the

assailant. Officer Mohn tried to contact Brooks to gather additional information about

Adkins.  Brooks did not return his phone calls.  Officer Mohn and other officers made 10-

15 visits to Brooks' home, but she never answered the door.  Officer Mohn added "every

single time that I went to the residence, two vehicles were in the driveway, light on

upstairs," but there was no response.  Tr., Vol. VII at p. 667.  Although Brooks claimed

Adkins texted her and admitted assaulting her, she did not provide Officer Mohn with the

text message. Officer Mohn attempted to locate Adkins using the law enforcement

database and Google, but was unsuccessful.

{¶17}  Kenyona Brooks was called as the court's witness. During the State's cross-

examination, Brooks stated she has two children, and Appellant is the father of her oldest

child. However, Brooks denied ever being in a romantic relationship with Appellant.

Brooks indicated she has known Appellant for ten years.

{¶18}  Brooks recounted, on the evening of April 30, 2023, she was home with her

two children and "a guy [she] was talking to named Derrick" came over.  *Id.* at p. 400.

Brooks could not recall speaking with Lieutenant Ford, Officer Mohn, or Officer Cooke

specifically, but did recall speaking with law enforcement.  Brooks acknowledged she told

officers Appellant caused her injuries. She testified she found Appellant asleep on the

couch in the living room after she came to.  Brooks claimed Appellant never touched her, but explained she touched him, grabbing his shirt as she tried to wake him up. Brooks could not remember what part of Appellant's shirt she grabbed as she tried to rouse him.

{¶19}  Brooks identified State's Exhibit 46, a statement dated July 14, 2023, which she acknowledged she had written and delivered to the Prosecutor's Office and Appellant's previous attorney.  Therein, Brooks stated a friend and Derrick Adkins were visiting on the evening of April 30, 2023. The three had been drinking and Brooks went to lay down. Brooks fell asleep and, at some point, her friend and Adkins left. When Brooks woke up, Appellant was asleep on the couch in the living room.  Brooks assumed Appellant had assaulted her, but she subsequently received a text from Adkins, apologizing for what had happened. As Brooks regained her memory after the assault, she remembered Adkins came into her bedroom and tried to have sex with her.  When she resisted, he assaulted her and she passed out.

{¶20}  Brooks admitted she and Appellant "had a couple of conversations" while the case was pending. *Id.* at p. 406. When the State asked Brooks if she would "be surprised to know that there's 300 jail calls involving you and [Appellant]" while the case had been pending, Brooks responded, "Probably not." *Id.* The State played a jail call from July 10,2023, during which Appellant told her she needed to do "something and it's about a dismissal." *Id.* at p. 409.

{¶21}  During defense counsel's cross-examination, Brooks denied Appellant ever exerted any pressure on her to change her story. Brooks assumed Appellant assaulted her because he was at her home when she regained consciousness. She did not know Derrick Adkins was the perpetrator until he contacted her and apologized.

{¶22} LaShalle Mosley testified, approximately seven (7) years ago, she and Brooks were working for the same company and became best friends. Mosely stated the two women are like sisters and talk daily. Mosley explained, if Brooks was in a relationship, she (Mosley) would know about it. Brooks never told Mosley she was in a relationship with an individual named Derrick Adkins, and Mosely had never heard the name. Mosely was aware of Brooks' relationship with Appellant, describing it as off and on. Mosely was concerned for Brooks when the relationship with Appellant was "on," recalling times Brooks arrived at her home with black eyes.

{¶23} At the end of April, beginning of May, 2023, Appellant again was living in Brooks' home. During the early morning hours of May 1, 2023, Mosely received a video chat on Messenger from Brooks. Brooks typically did not video chat Mosely, giving Mosely the feeling there might be some kind of emergency. When Mosely answered, Brooks did not speak, but Mosely saw her face, which was swollen and bloody. Brooks' eyes were swollen shut, but Mosely could see tears streaming down her face. Mosely immediately called 9-1-1. Her initial thought was Appellant had beaten her up and she was concerned for Brooks' well-being. Mosely texted Brooks and told her friend she had called the police. Brooks responded the police had driven past the house. Mosely called 9-1-1, a second time, "begging them to go to the door." Tr., Vol. VI, at p. 495.

{¶24} Morgan Crank, a trauma nurse practitioner with Ohio Health, testified she evaluated and assessed Brooks in conjunction with the on-call ER physician. The ER physician activated Brooks as a level 2 trauma based upon the report of EMS and the mechanism of her injuries. Crank stated Brooks' face was swollen and stained with dry blood. Brooks was confused and slow to answer. Crank also noted Brooks appeared to

be intoxicated and the results of her bloodwork revealed her BAC was .072. Brooks was diagnosed with facial contusion and a concussion. Crank identified the attending physician's history and physical examination note, which read:

> 32-year-old female without significant past medical history representing as Level 2 trauma after assault. Patient reports being in an abusive relationship. She was assaulted by her partner with fist and kicks. Denies being struck by other objects. Reports being struck in face repeatedly.
>
> *Id.* at p. 538.

{¶25} Ohio Bureau of Criminal Investigation DNA analyst Emily Feldenkris testified she conducted DNA testing on the t-shirt and sweatpants Appellant was wearing at the time of his arrest. After preliminary testing revealed the presence of blood in the stains on the t-shirt, Feldenkris analyzed the DNA. The DNA found on the t-shirt and the sweatpants was a mixture with Brooks being the major contributor. Feldenkris added the stain on the sweatpants also was a mixture with Brooks again being the major contributor. On cross-examination, Feldenkris agreed DNA testing does not explain how DNA was transferred to the particular point where it is found.

{¶26} After hearing all the evidence and deliberating, the jury found Appellant guilty on both counts. The trial court merged Count 2, domestic violence, with Count 1, felonious assault. The State elected to proceed on Count 1. The trial court sentenced

Appellant to an aggregate minimum term of incarceration of 8 years to a maximum term of 12 years on Count 1.

**{¶27}** It is from this conviction and sentence Appellant appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED IN PERMITTING EXPERT TESTIMONY WHEN THE STATE OF OHIO FAILED TO COMPLY WITH CRIM. R. 16(K) AND NO GOOD CAUSE WAS SHOWN TO MODIFY THE TIME REQUIREMENTS, CAUSING PREJUDICE TO APPELLANT.

II. MR. HARRIS' CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.

IV. THE STATE OF OHIO ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN IT FAILED TO CORRECT FALSE TESTIMONY AND WHEN IT MISREPRESENTED FACTS DURING CLOSING ARGUMENTS.

I

**{¶28}** In his first assignment of error, Appellant maintains the trial court erred in allowing the State to present expert testimony from the DNA analyst as the report was

provided to defense counsel six (6) days before the original trial date, in violation of Crim.R. 16(K).

**{¶29}** Crim.R. 16(K) provides:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, ***which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial***.

(Emphasis added.)

**{¶30}** The purpose of Crim.R. 16(K) is to prevent "either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report." Crim.R. 16(K), 2010 Staff Notes. In promoting "more open discovery" in criminal cases, the aim of Crim.R. 16(K) is to level the lopsided playing field by strengthening the defendant's right to know the evidence the State will present against him or her at trial. *See State v. Boaston*, 2020-Ohio-1061, ¶ 44.

**{¶31}** The trial was originally scheduled for September 18, 2023. Upon realizing the report from the DNA analyst had not been provided to defense counsel 21 days prior

to trial, the State requested a continuance. The trial court granted the continuance and rescheduled the trial for October 2, 2023.

{¶32} "If a party fails to comply with Crim.R. 16's discovery requirements, the court may order the party to permit discovery, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." *State v. Bates,* 2010–Ohio–5636, ¶ 11 (2nd Dist.), citing Crim.R. 16(E)(3). It is within the trial court's discretion to decide what sanction to impose for a discovery violation. *State v. Wilson*, 91 Ohio App.3d 611, 614 (2nd Dist. 1993). A trial court should impose the least severe sanction for a discovery violation which is consistent with the purposes of the rules of discovery. *State v. Valdez*, 2017-Ohio-241, ¶ 124 (3rd Dist.). A continuance, upon proper motion, is a favored method to avoid prejudice that may flow from a failure to provide discovery yet ensure the charges against an accused are tried timely and fairly. *State v. Parks*, 69 Ohio App.3d 150, 155 (2nd Dist. 1990).

{¶33} "In the event of a discovery violation, an inquiry into whether the court abused its discretion in its order must address (1) whether the prosecution's failure to provide discovery was a willful violation of Crim.R. 16, (2) whether foreknowledge of the evidence would have benefitted the accused in the preparation of his defense, and (3) whether the accused was prejudiced by the evidence concerned." (Citations omitted.) *Bates*, 2010-Ohio-5636, at ¶ 12 (12th Dist.).

{¶34} We find the trial court did not abuse its discretion in granting the continuance and permitting the State to present the testimony of the DNA analyst. When the prosecutor learned Appellant had not received the expert report, she quickly rectified the

situation and provided defense counsel with the report on September 12, 2023. The trial court continued the matter until October 2, 2023, 21 days (including October 2nd) from the day defense counsel received the report. Even if October 2nd is not included in the 21-day calculation, Crim.R. 16(K) provides the 21-day period "*may be modified by the court for good cause shown, which does not prejudice any other party.*" Crim.R. 16(K). We find the trial court balanced Appellant's constitutional right to a speedy trial and compliance with the rule by imposing the least severe sanction for the State's unwilful discovery violation.

**{¶35}** Appellant's first assignment of error is overruled.

II

**{¶36}** In his second assignment of error, Appellant challenges his conviction as against the manifest weight of the evidence. Specifically, Appellant contends the jury clearly lost its way in convicting him as "[t]he record is filled with testimony that is not only contradictory but raises significant questions as to whether the correct man is being prosecuted." Brief of Appellant at p. 9. We disagree.

**{¶37}** On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶38} Upon review of the evidence as set forth in our Statement of the Case and Facts, supra, as well as the entire record in this matter, we find Appellant's conviction was not against the manifest weight of the evidence. Appellant focuses on Brooks' testimony at trial accusing Derrick Adkins of assaulting her and Brooks' level of intoxication on the night of the incident to support his claim he was not the perpetrator. However, the overwhelming evidence adduced at trial belies Appellant's contention.

{¶39} The three officers who responded to the scene all testified Brooks identified Appellant, who was in present in her home when the officers arrived, as her assailant. Video footage from the body cameras corroborate the officers' testimony and the jury heard Brooks' account of the incident in real time. LaShalle Mosley received a video chat from Brooks on the evening of the assault. Brooks did not speak, but Mosely saw her face, which was swollen and bloody. Mosley testified Appellant was living with Brooks at the time. When Brooks presented at the hospital, she reported being in an abusive relationship and that she had been assaulted by her partner.

{¶40} Officer Mohn investigated Brooks' allegations Derrick Adkins assaulted her. Officer Mohn detailed his futile attempts to locate Derrick Adkins as well as gather additional information from Brooks. Officer Mohn searched law enforcement databases and Google to locate Adkins, but he came up empty. Officer Mohn repeatedly called Brooks, but she did not return his calls. He and other officers presented at her home 10-15 times, but no one answered the door despite the fact lights were on in the home and there were two cars in the driveway. Brooks claimed to have text messages from Derrick Adkins, but did not provide this purported exculpatory evidence to law enforcement.

**{¶41}** A jury is free to accept or reject any and all of the evidence offered by the parties and assess the witness' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." (Citation omitted.) *State v. McGregor,* 2016-Ohio-3082, ¶ 10 (5th Dist.).

**{¶42}** Appellant's second assignment of error is overruled.

III

**{¶43}** In his third assignment of error, Appellant raises a claim of ineffective assistance of counsel.

**{¶44}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153 (1988). In order to prevail on a claim of ineffective assistance of counsel, an appellant must show counsel's performance fell below an objective standard of reasonable representation and, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989). In other words, an appellant must show counsel's conduct so undermined the proper functioning of the adversarial process the proceedings cannot be relied upon as having produced a just result. *Id.* In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley* at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

**{¶45}** In order to warrant a reversal, an appellant must additionally show he was prejudiced by counsel's ineffectiveness. Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, quoting *Strickland* at 697.

**{¶46}** Appellant asserts trial counsel was ineffective for 1) failing to object to LaShalle Mosley's testimony had observed Brooks with black eyes, which were purportedly caused by Appellant, and 2) for stipulating to Appellant's prior conviction.

**{¶47}** LaShalle Mosley testified she was aware of Brooks' relationship with Appellant, and described it as off and on. Mosely stated she was concerned for Brooks when the relationship with Appellant was "on" and recalled times Brooks arrived at her home with black eyes. The State did not offer Mosley's testimony as character evidence to show Appellant's propensity or inclination to beat up Brooks. Rather, Mosley's testimony explained why she was concerned for Brooks and immediately thought Brooks needed help when Mosley received a video chat from Brooks.

**{¶48}** Appellant also claims trial counsel was ineffective for stipulating to Appellant's prior conviction. Appellant claims, without the stipulation, the State would not have been able to prove the prior conviction because the judgment entry relative thereto did not comply with Crim. R. 32(A).

**{¶49}** "The effect of a prior-conviction stipulation is not to remove the prior conviction from the jury's knowledge, but instead to prevent the jury from hearing the specific facts underlying the prior conviction, not the bare fact of the prior conviction." (Citation omitted.) *State v. Thomas*, 2024-Ohio-2281, ¶ 37 (4th Dist.). Trial counsel's decision to stipulate to the fact of a defendant's prior conviction is generally considered a matter of trial strategy. *Id.* at ¶ 38.

**{¶50}** Assuming, arguendo, trial counsel was ineffective for failing to object to Mosley's testimony and for stipulating to the prior conviction, Appellant has failed to show he was prejudiced as a result. Mosley testified she was concerned for Brooks when the relationship with Appellant was "on," recalling times Brooks arrived at her home with black eyes. This evidence alone did not lead the jury to convict Appellant when it otherwise would have acquitted him. The jury was presented with overwhelming evidence Appellant assaulted Brooks on May 1, 2023. In addition, had trial counsel not stipulated to the prior conviction, the State would have had the opportunity to present evidence of such to the jury. The jury would have heard the specific facts of the prior conviction.

**{¶51}** Based upon the foregoing, we find Appellant has not demonstrated trial counsel was ineffective.

**{¶52}** Appellant's third assignment of error is overruled.

IV

**{¶53}** In his final assignment of error, Appellant submits the State engaged in prosecutorial misconduct. Specifically, Appellant maintains there were "substantial instances of prosecutorial misconduct that substantially infringed upon Defendant's constitutional rights and compromised the integrity of the jury's verdict." Brief of Appellant

at p. 17. First, Appellant argues the prosecutor improperly vouched and bolstered the credibility of LaShalle Mosley by commenting on her motivation for testifying. Appellant further contends the prosecutor relied on Mosley's improperly elicited testimony to "[paint] Appellant as a serial abuser, while also appealing to the sympathies of the jury," when there was no evidence Appellant had committed multiple acts of violence against Brooks. *Id.* at p. 19. Further, Appellant asserts the prosecutor failed to clarify and mischaracterized Brooks' testimony with respect to a jail call to her from Appellant.

**{¶54}** Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments. *State v. Hunt*, 2013-Ohio-5326, ¶ 18 (10th Dist.). "We assess prosecutorial misconduct in closing arguments by asking 'whether the remarks were improper and, if so, whether they prejudicially affected [the] substantial rights of the defendant.' " (Citations and internal quotations omitted.) *State v. Knuff,* 2024-Ohio-902, ¶ 238. A conviction may be upheld in the face of a prosecutor's improper remarks when it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" regardless of the comments. *United States v. Hasting*, 461 U.S. 499 (1983) (new trial unwarranted despite prosecutor's improper argument because of "overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants").

**{¶55}** We find the prosecutor's statements to be based upon reasonable inferences to the evidence presented during the trial. Assuming, arguendo, the prosecutor's statements were improper, "[a]n improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would

have found the defendant guilty even without the improper comments." (Citation omitted.) *State v. McAlpin,* 2022-Ohio-1567, ¶168. The conduct of a prosecuting attorney during closing argument did not deprives Appellant of a fair trial. *See State v. Apanovitch*, 33 Ohio St.3d 19, 24 (1987). The evidence against Appellant was overwhelming and there is little chance, absent the improper comments, the result of his trial would have been different. Furthermore, any potential prejudice was mitigated by the trial court's instruction to the jury closing arguments are not evidence. *Id.* at ¶ 188.

**{¶56}** Based upon the foregoing, Appellant's fourth assignment of error is overruled.

**{¶57}** The judgment of the Richland County Court of Common Pleas is affirmed.


By: King, J.

Gwin, P.J.  and

Wise, J. concur