**[Cite as *State v. Kitto*, 2025-Ohio-5301.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-24-1199

     Appellee                                  Trial Court No.  CR0202202714

v.

Michael James Kitto                             **DECISION AND JUDGMENT**

     Appellant                                 Decided:  November 25, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Eric G. Eckes, Martin S. Pinales, and Zachery R. Hullinger,
for appellant.

* * * * *

## I.  Introduction

{¶ 1} This matter is before the court on the appeal of appellant, Michael Kitto, challenging his conviction and an aggregate prison sentence of life without the possibility of parole, following a jury trial. For the reasons that follow, we reverse and remand for a new trial.

## II. Background and Procedural History

### A. The Injury, Investigation, and Indictment

**{¶ 2}** On October 6, 2022, three-year-old D.H. sustained head injuries while in the care of Kitto, the live-in boyfriend of D.H.'s mother, Kelly. Kitto called 911 and texted Kelly to report an accident. D.H. was not breathing when paramedics arrived. Kitto told the paramedics and responding police officers that D.H. was running through the home and, while he did not witness the collision, it appeared D.H. ran into a door and struck his forehead, then fell and struck the back of his head on the floor. Kitto reported that D.H. defecated after striking his head and lost consciousness, and Kitto attempted to revive D.H. by placing him in the shower. D.H. was transported to the emergency room, then life-flighted to the children's hospital and stabilized. After doctors determined D.H. was brain dead, Kelly and D.H.'s father made the decision to remove D.H. from life support. D.H. died shortly after.

**{¶ 3}** Prior to October 6, Kelly had no concerns about leaving D.H. or her eight-year-old son with Kitto, and Kitto was integrated into family life and had a relationship with the boys. Kelly had never witnessed Kitto getting physical with the boys, and Kitto was helping her potty-train D.H. Kelly did acknowledge a prior incident, in which D.H. was running and fell, striking his head. Kelly was concerned enough to take D.H. to the doctor, but D.H. did not suffer serious injury in that incident.

**{¶ 4}** In the week preceding the injury of October 6, Kitto, Kelly, and D.H. all worked in the yard, removing and burning vines pulled from the fence and house. Kelly

2.

later learned the plants were poison ivy, and at the time of the injuries, D.H. had a poison ivy rash on his face and body. D.H. then spent a couple of days with his father and returned home the morning of October 5. When Kelly put D.H. to bed on October 5, she noted no injuries on D.H., and no injuries to his head aside from the poison ivy rash on his face. Kelly also acknowledged that she did not specifically check D.H. for injuries.

{¶ 5} After October 6, Kelly had limited contact with Kitto and discouraged or ignored his attempts to talk to her. Kelly spoke with Kitto by phone immediately after receiving his text and then, again, after she and D.H.'s father learned D.H. was brain dead. In her limited conversation with Kitto, Kelly asked him to explain what happened and Kitto told Kelly of the accident. When Kelly continued to ask what happened, Kitto stated, "I didn't beat your kid to death, Kelly." Kitto's mother picked him up from the home and soon after, Kelly noticed a voicemail on her phone. She played the message, determined Kitto had butt-dialed her, and listened to a conversation between Kitto and his mother, with Kitto telling his mother "this is not good" and discussing with his mother whether he needed to leave the country. Kelly saved the recording and shared it with police.

{¶ 6} Police investigated the incident. They photographed the scene and, while there was initial confusion regarding whether Kitto reported D.H. as running into a wall or the door, police collected the door as evidence. D.H.'s injuries were also photographed, and Dr. Randall Schlievert, a child abuse expert, was consulted to examine

3.

D.H. and provide an opinion regarding D.H.'s injuries, in addition to an autopsy performed to determine the cause and manner of death.

{¶ 7} On October 11, 2022, the state indicted Kitto on one count of aggravated murder in violation of R.C. 2903.01(C) and (G), an unclassified felony; one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony; one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree; and one count of endangering children in violation of R.C. 2919.22(B)(1), (E)(1), and (E)(2)(d), a felony of the second degree. The counts for aggravated murder, murder, and felonious assault each included a repeat violent offender specification pursuant to R.C. 2941.149.

{¶ 8} On October 19, 2022, Kitto was arraigned and entered not guilty pleas to each charge. The parties engaged in extensive discovery and Kitto requested several continuances of trial, with the trial court setting nine different trial dates in the year following arraignment. In preparation for trial, Kitto retained experts, including Dr. Maneesha Pandey, a former deputy coroner for the Lucas County Coroner's Office, Kenneth Monson, a biomechanical engineer, and Professor Keith Findley, an attorney and professor affiliated with the Innocence Project at the University of Wisconsin Law School, with expertise relevant to the error rate of child abuse accusations. Professor Findley's testimony was intended to address and challenge Dr. Schlievert's findings by noting the error rate in cases utilizing Schlievert's methodology and underlying studies.

4.

**B. Discovery Dispute and Crim.R. 16(K)**

{¶ 9} Kitto did not retain and obtain an expert report from Professor Findley until June 2024, and a discovery dispute arose over his testimony based on timely notice. Kitto's trial counsel emailed the professor's expert report on June 23, 2024, prior to the deadline for producing the report according to Crim.R. 16(K), and counsel fax filed a notice of email service of the report on June 24, 2024. The deadline for producing the report was June 25, 2024. The state claimed it never received the email and instead received the report from Kitto's counsel on July 2, 2024, two weeks before the scheduled trial. The state did not address the separate notice, fax filed on June 24, noting the emailed report.

{¶ 10} On July 3, 2024, the state filed a motion in limine to preclude the testimony of Professor Findley. In the alternative, the state argued that Professor Findley was not qualified to offer an expert opinion on Dr. Schlievert's findings and Professor Findley's testimony would be inadmissible and improper, because he is not a medical doctor, characterizing the purported testimony as a legal opinion regarding Dr. Schlievert's medical evaluation and conclusions. The state further argued that a one-week delay in receiving the expert report caused prejudice to the state, without specific argument supporting the nature of the claimed prejudice.

{¶ 11} On July 10, 2024, Kitto filed a motion to continue the trial date, seeking time to address the state's July 3, 2024 motion in limine, as well as other motions recently

5.

filed by the state. The trial court denied the motion for continuance, noting the prior continuances granted as a basis in the denial.

{¶ 12} On July 12, 2024, Kitto filed a response in opposition to the state's motion in limine. Kitto argued he served his expert report by email on June 23, 2024, followed up with notice of that service by fax filing on June 24, 2024, and upon notice from the state that it was not received, immediately forwarded a copy of the report and the "sent message" on July 2, 2024. Kitto argued he served the report within 21 days in good faith, and noted service on the docket, satisfying the requirements of Crim.R. 16. As to the content of Professor Findley's testimony, Kitto argued that such testimony was both admissible and proper, and Professor Findley would counter the testimony of Dr. Sclievert, as demonstrated by his expert report addressing Dr. Schlievert's methodology, studies, and rationale. Based on this limited purpose, Kitto argued that any delay in the state's receipt of the report resulted in no prejudice, necessitating exclusion of Professor Findley's testimony.

{¶ 13} The trial court held a hearing on the motion on July 15, 2024, the day before the scheduled start of trial. While acknowledging that the trial court had discretion to permit the late service of the expert report, the state disputed Kitto's "good faith service" argument, contending there could be no good faith where service was "not relayed nor hand delivered nor emailed to the State of Ohio within the proper 21-day time frame." The state further argued that the contents of the report demonstrated that Professor Findley was not a proper expert to testify on the subject matter in which he

6.

purports expertise, characterizing Findley's testimony as an alternative medical opinion by a non-medical expert, biased by long association with the Innocence Project.

{¶ 14} In listing its objections, the state demonstrated it had thoroughly reviewed Professor Findley's report. The state argued that Professor Findley's reliance on the expert reports of Kitto's other experts was "clearly improper" because he based his opinion "upon information he received from paid experts from defense counsel." The state also objected to the content of the report, arguing bias resulting from Professor Findley's experience with the Innocence Project. The state further argued that Professor Findley's report was "self-serving" because Findley cited to his own writings 11 times in footnotes. The state argued:

> There's so much to go through with respect to this particular report. There are certain quotes in here that talk about the mainstream medical community. Specifically I'm looking at one on page 7 where they still diagnose shaken baby syndrome and talk about abusive head trauma because it is a finding that is accepted in the medical community. He claims that there's a lack of scientific validation with respect to these findings.
> However, there are reasons that there are mandatory reporters when abuse is suspected. In many areas of professional America, schools, hospitals, among a few. Dr. Schlievert has a responsibility to report when he sees what appears to be abuse such as in this case.

While addressing the content of Professor Findley's report, noting specific findings, the state argued that Professor Findley was a non-medical expert who purports to "put the medical field on trial" by attributing "cognitive bias" to Dr. Schlievert's diagnosis of abusive head trauma.

{¶ 15} In response to the state's motion and argument, Kitto's trial counsel relied on the written brief in opposition to the motion. In addition, counsel argued that the email

7.

was sent and notice of that service was filed in the case, with any failure of email transmission no fault of Kitto. To illustrate this point, Kitto's trial counsel noted that the state was in communication with counsel during the week of June 24, and the state did not inform trial counsel that the email was not received, stating:

> There was a phone call placed from [the Prosecutor] to counsel who immediately responded with an email, I'm on vacation in California, give me a call. With an email response that said, enjoy vacation, talk to me when you get back. And that's exactly what counsel did. And in that discussion upon return was when it was found out that he hadn't received it.

Kitto's trial counsel then proffered copies of the email exchanges and the contents of a voicemail to the trial court, as evidence of the contact between the state and Kitto's trial counsel during this period.[1] In the alternative, Kitto argued that even if the trial court deemed delivery was delayed until July 2, the trial court had discretion to modify the 21-day requirement under Crim.R. 16(K).

{¶ 16} As to Professor Findley's expertise and the propriety of his testimony, Kitto argued that the testimony was limited to Dr. Schlievert's reliance on a 2013 "meta study authored by Maguire, et al., in which he cites directly to that study and indicates that because of the findings of that study, it is not likely, not probable, that this could be an accidental situation." Kitto argued that Professor Findley would testify to challenge Dr. Schlievert's reliance on the studies, and he could do so despite having no medical

---

[1] The state also referenced "documentation from Lucas County Information Services showing that no email from [Defense Counsel] to the State was received pertaining to anything with respect to this case." However, while the state referenced producing its "documentation" on the record, there is no proffer of supporting documentation from either party in the record on appeal.

8.

expertise because a finding of abuse is not a medical diagnosis, necessary for medical treatment, but is a determination with legal ramifications and "direct comment on the causation, whether it was purposeful or done with criminal intent." Kitto argued that Professor Findley would address more recent scholarship than Dr. Schlievert's 2013 studies, indicating "studies like Maguire that Dr. Schlievert cites to have been challenged." Specifically, Professor Findley's testimony would be limited to "the application of scientific studies in peer-reviewed articles to determine abuse."

{¶ 17} The State countered this argument, contending Professor Findley was "trying to in a veiled way practice medicine by indicating that Dr. Schlievert didn't practice medicine the right way." Additionally, the state argued that permitting Professor Findley's testimony would "confuse the issues" for the jury.

{¶ 18} In granting the state's motion in limine, excluding Professor Findley's testimony at trial, the trial court stated:

> I have reviewed both the State's motion in limine and the defendant's opposition as well as the case law cited by each. I have also listened to the arguments that have been presented here today. And as you [ ] well know…this report was filed 14 days before trial.
>
> Rule 16(K) requires that expert witnesses' reports be filed 21 days prior to trial. The rule also states that failure to disclose the written report shall preclude the expert's testimony at trial.
>
> Pursuant to *State v. Boaston,* the rule removes the trial court's discretion and requires exclusion of the expert's testimony when the report is not disclosed in accordance with this rule.
>
> And [Defense Counsel], you state disclosure versus receipt, and I think that *State v. Boaston* clears that up for us, because in paragraph 58, the court states we agree with *Boaston* that the State violated Criminal Rule

16(K) by failing to provide a written report. And to me, provide means receipt, not just disclosure.

As you stated that for good cause, the court has the authority to make exceptions. However, that authority is very limited. It was counsel's responsibility to ensure that the report was received 21 days prior to trial. … [T]he failed attempt to provide the report is not an exception to the rule for good cause.

Therefore, I'm going to grant the State's motion in limine regarding Mr. Findley's testimony and he will not be allowed to testify.

I could give several reasons with respect to the arguments made with his report. However, since I found that 16(K) was not complied with, I will withhold those opinions with respect to the rest of the report. That motion in limine will be granted.

{¶ 19} Because the trial court found procedural issues controlling, it did not address the substantive arguments regarding the admissibility of Professor Findley's proposed expert testimony and held no *Daubert* hearing. Upon the trial court's ruling, Kitto's trial counsel noted his objection and requested leave to proffer Professor Findley's proposed testimony into the record, either at trial or before trial. The state objected to the proffer, and the trial court denied Kitto's request. Thus, only Professor Findlay's expert report and counsel's argument is part of the record on appeal.

## C. Trial Testimony

{¶ 20} On July 16, 2024, jury trial began. The state presented testimony of the first responders, medical providers, the deputy coroner, and the investigating officers, along with testimony of D.H.'s mother, Kelly. The state also presented the body-worn camera recordings and 911 call by Kitto, with the state's evidence demonstrating the serious

injury D.H. received and the efforts made to save his life, facts not disputed by Kitto. Kelly also admitted that, until the day of the injury, she had no qualms about leaving either of her children with Kitto and did not initially believe he had caused D.H.'s serious injury. The medical providers, deputy coroner, and Dr. Schlievert, however, testified that D.H.'s injuries were inconsistent with accidental injury. Dr. Schlievert testified for the state as an expert in child abuse and neglect, and he indicated that D.H.'s injuries could only be attributed to abuse.[2]

{¶ 21} Dr. Schlievert described his abuse determination as diagnosis based on medical history, physical examination, treatment, and test results. He testified that there was nothing in D.H.'s medical history that helped explain his injuries, and the test results showed extensive intercranial bleeding and brain swelling that caused herniation of the brain tissue. The physical exam showed bruising on D.H.'s right forehead and both ears, and based on that physical exam and scans, Dr. Schlievert identified four separate discrete planes of injury to the head. Dr. Schlievert also noted severe hemorrhaging in the retinas of both eyes. As to the cause of the injuries, Dr. Schlievert testified that, in his expert opinion, D.H. sustained his injuries because of abusive head trauma. He testified, "[D.H.'s] head was either struck multiple times with a force that killed him or his head hit something multiple times that killed him, but it wasn't the accident as reported, in my opinion."

---

[2] The state acknowledges that Dr. Schlievert was qualified as an expert during trial, but maintains he nevertheless testified as a fact witness as the treating doctor and/or consultant for D.H.'s medical case.

11.

{¶ 22} On cross-examination, Dr. Schlievert acknowledged that he does not evaluate accidental injuries in his current practice but is called for consultation where the cause of childhood injuries is suspected abuse, to determine whether abuse is involved. He also testified that a diagnosis of abuse affects treatment in that it leads to protection from future abuse, but there are no diagnostic tests to confirm or eliminate abuse as the cause of injury. Dr. Schlievert testified regarding the generally accepted standards in diagnosing abusive head trauma, referencing specific studies, with head trauma placed on a spectrum in terms of cause from shaking a baby to direct blows to the head. When asked about studies that refuted the existence of standard criteria for identifying abusive head trauma, Dr. Schlievert testified that he did not disagree, noting the determination of abuse is based on differential diagnosis, assessing four components: genetic, anatomic abnormalities and infections, accidental, and abuse. Dr. Schlievert also acknowledged there were studies that attempted to calculate the misdiagnosis rate of abuse and he, himself, was sometimes wrong, but when Kitto's trial counsel attempted to question Dr. Schlievert on specific studies that demonstrated significant misdiagnosis rates, the state objected, and the following exchange occurred in a bench conference.

> The Court:     How are these studies relevant to the injuries that this little boy sustained?

> [Defense Counsel]: It goes towards the ability of a child abuse expert to accurately diagnose abuse and that there are errors and there's a high percentage of.

> The Court:     He already admitted that sometimes he's wrong.

12.

[Defense Counsel]: Sometimes he's wrong, but I can correlate in his field the misdiagnosis rate is 39 percent. The misdiagnosis, the jury would need to hear that.

[Prosecutor]: Judge, I would ask that the court not allow this line of questioning. He's referencing articles that if this doctor's not familiar – maybe he is and he can speak directly to it. If he is not familiar with these articles, there is no telling where they came from, what the author's history is, what their motive is, what their agenda is with respect to writing the article. And if he's familiar with the article, ask away. If he's not, then I would object to it being on the record.

The Court:      I'm going to sustain the objection.

{¶ 23} Following the bench conference, Kitto's trial counsel questioned Dr. Schlievert on the studies he had reviewed, and Dr. Schlievert acknowledged that serious injury could result from a short fall "extremely rarely," but noted the study that counsel referenced was "highly flawed" and another study calculated the likelihood as "one in essentially two million short falls." When pressed, Dr. Schlievert admitted that the calculation was more accurately stated as one in 1.48 million.

{¶ 24} Next, Kitto's trial counsel questioned Dr. Schlievert on the Maguire study, specifically cited by Dr. Schlievert in his report. Counsel noted that the study addressed both accidental and abusive injury, with accidental injury roughly half the cases, and found there are no retinal signs unique to an abusive injury. Dr. Schlievert acknowledged this, and when asked whether he relied on the retinal injuries in determining abuse, he stated he believed he made his determination on the entire record, and not just the retinal damage.

13.

{¶ 25} The state then called the deputy coroner, Dr. Thomas Blomquist, to testify regarding manner and cause of death. Pertinent to this case, Dr. Blomquist testified that the cause of death was homicide, abusive trauma. In reaching this conclusion, Dr. Blomquist examined the medical records and D.H.'s body, and his examination revealed seven points of contact based on contusions to D.H.'s head and internal bleeding and injury to the brain, brainstem, the eyes, the optic nerves and the spinal cord at the base of the neck. Dr. Blomquist further testified that the injuries he observed are typically the result of high-speed motor vehicle accidents. He testified that, based on selected microscopic examination, the injuries observed were recent.

{¶ 26} On cross-examination, Dr. Blomquist identified his preliminary report, prepared before he had results from all tests and prior to fully examining the eyes and brain. Dr. Blomquist admitted that, in addition to examining D.H.'s body, he also reviewed an investigator's report noting a suspicious death and suspected abuse. This included Dr. Schlievert's diagnosis of subdural hemorrhage, retinal hemorrhage, and detached retinas, with reliance on the retinal detachment diagnosis as the autopsy process created "artifact" and precluded Dr. Blomquist from making that determination. Dr. Blomquist testified he did not speak with Dr. Schlievert as part of his autopsy. He also did not review the 911 call or any direct statements made by any party to the police, but the police attended the autopsy and explained the allegations to Dr. Blomquist, and he knew "that there were potential for multiple stories that could have been offered whether or not he hit a door or hit a wall at that time and so it was very nebulous between one or two

stories as to what actually occurred and whether or not he hit his head on the floor on the way down." Dr. Blomquist testified that no one mentioned the possibility that D.H. was struck or punched. He further testified that the police participation was limited to answering questions regarding what they observed at the scene.

{¶ 27} As to his findings, Dr. Blomquist testified that the microscopic samples demonstrated injury within a day or less, but he admitted he did not take samples from all injuries. Dr. Blomquist also testified that he could not identify the amount of force necessary to cause D.H.'s injuries, as he is "not an engineer." His opinion regarding the amount of force was limited to comparisons to car crash victims.

{¶ 28} Following Dr. Blomquist's testimony, the state rested. Kitto moved for acquittal pursuant to Crim.R. 29, arguing that no evidence was presented as to causation. The state opposed, arguing the evidence demonstrated Kitto caused the injuries to D.H. that resulted in his death. The trial court denied the motion.

{¶ 29} As his first witness, Kitto called Professor Kenneth Monson, a biomechanical engineer. Professor Monson was declared an expert in the areas of biomechanics and biomechanics of traumatic brain injury. He indicated that he reviewed the medical and police records, limiting his consideration to the mechanics or manner of the injury. Professor Monson testified regarding his method of applying the principles of mechanics to determinations of the mechanics of D.H.'s brain injury.

{¶ 30} The state made numerous objections to Professor Monson's testimony, often without stating a basis for the objection, and the trial court sustained the objections,

often without considering a basis for the objection. For example, Professor Monson testified regarding his calculations of the mechanical properties of D.H.'s head based on size measurements taken at autopsy, with reliance on existing studies cited in his report to account for variables with the skull. The state challenged this reference to studies, as follows:

> [Prosecutor]: Objection, Your Honor.
>
> The Court:    Sustained.
>
> [Defense Counsel]:  On what grounds?
>
> [Prosecutor]: It's outside the scope of the report.
>
> [Defense Counsel]:  Testified that he got the number with studies. He is going to explain what those studies are.
>
> [Prosecutor]: The studies are not included in the report, counsel.
>
> [Defense Counsel]:  They are cited.
>
> The Court:    I sustained the objection.

{¶ 31} With this limitation, Professor Monson testified that D.H. could generate a force on his fall up to 176 G's, and the estimated maximum injury threshold for severe head injury was 175 G's. Comparing these values, Professor Monson testified that "the upper end of the range that I calculated for this falling scenario just slightly surpasses this injury threshold." Accordingly, he testified that "the injury threshold is that of a 5 percent risk of life-threatening injury." He further testified that the studies document cases of severe injuries and even death resulting from short falls. Based on his training and

analysis, Professor Monson concluded that a reconstruction of the incident based on Kitto's claim of accidental injury showed D.H. could sustain his injuries as Kitto claimed. At the same time, Professor Monson did not rule out abuse as another potential cause of D.H.'s injuries, based on principles of mechanics.

{¶ 32} On cross-examination, the state questioned Professor Monson regarding his opinion of "possibility," and Monson reiterated that he did not represent he knew what happened, only what was possible based on the science. Professor Monson also admitted that he had to rely on certain assumptions to calculate velocity at the time of contact between D.H.'s head and the door or floor, but the assumptions were based on scientific principles and data relative to a human pediatric cadaver head. Monson further acknowledged that he had to extrapolate data, which was available for a 6-month-old and for a 6-year-old, because there was no data for a 3-year-old child available.

{¶ 33} The state further questioned Monson regarding things he did not include in his report, such as the contents of the 911 call, or Kitto's voicemail to Kelly, or witness statements. Professor Monson acknowledged that his review was limited to materials provided to him by the defense, which did not include investigative details, measurements from inside the home, or the detective's sketch of the scene.

{¶ 34} Kitto then presented the testimony of Dr. Pandey, which was taken as a videotaped deposition, prior to trial. Dr. Pandey agreed with the coroner's "cause of death" findings but did not agree with the coroner's conclusion of "abusive head trauma" as the manner of death.

17.

{¶ 35} The state challenged Kitto's direct examination of Dr. Pandey concerning the manner of death, arguing the manner of death determination went beyond the scope of Dr. Pandey's report. The trial court initially permitted Dr. Pandey to answer a question regarding possible manner of death, but before Dr. Pandey could speak, the state renewed its objection, the trial court sustained the objection, and Kitto's trial counsel withdrew the question.

{¶ 36} On cross-examination, the state questioned Dr. Pandey on reports that were not provided to her in preparing her expert report, including photographs of the victim's eyes and internal organs. The state also emphasized Dr. Pandey's finding that the manner of death could not be determined, questioning Dr. Pandey on all the possible manners of death, based on the available information. As a final question, the state asked Dr. Pandey if the manner of death could be homicide. Dr. Pandey responded affirmatively.

{¶ 37} On redirect, Kitto's trial counsel attempted to question Dr. Pandey on other possible manners of death, and the state objected. Trial counsel argued:

> [Defense Counsel]: Judge, the State got to go through various causes of death and ask this witness the same opinion. Defense would like the same leeway to do the same. The State opened the door for that, Judge.

> [Prosecutor]: Judge, her report has been authored and presented as an exhibit. If counsel intends to ask her a bunch of questions about what's not in her report, that's the objection. That's the rule. We know that you can't opine further than what is included in your report, per *State v. Boaston.*

{¶ 38} The trial court permitted additional questioning, and Dr. Pandey testified that the manner of death could not be determined based on her review of the case. This

18.

finding was presented in Dr. Pandey's expert report, included as a defense exhibit, stating as follows:

> Upon review of the case, the significant documented antemortem radiologic and postmortem autopsy injuries were traumatic brain injury with right subdural hemorrhage, subarachnoid hemorrhage, left parietal and temporal scalp hematoma, dislocation at atlanto occipital, atlanto axial joints with hemorrhage in the surrounding upper cervical nerve roots and bilateral retinal hemorrhages. There were no fractures of the skull, or facial bones.
>
> Based on the above review of the documentation available to Dr. Pandey it ***could not be ascertained accurately how the injuries occurred*** which resulted in blunt force trauma to the deceased. It is her opinion that [D.H. died of blunt force trauma to head and neck.

(Emphasis added).

{¶ 39} Kitto's final witness was John Szmania, a detective with the Sylvania Township Police Department. Szmania testified regarding his interview of Kitto as part of the police investigation. Szmania testified that Kitto told him that, by the time Kitto had turned the corner, D.H. was on the ground and Kitto assumed D.H. had hit a door. On cross examination, Szmania testified that most of his conversation with Kitto occurred at the scene and was recorded on his body worn camera.

{¶ 40} Following Szmania's testimony, the defense rested and the state presented no rebuttal case. The matter proceeded to closing arguments.

**D. Closing Arguments and Verdict**

{¶ 41} The state argued that the medical evidence demonstrated abusive head trauma as the cause of death, and Kitto was the only person with D.H. at the time of injury, emphasizing that the state's medical witnesses found Kitto's theory of the injury

19.

unbelievable. The state also emphasized Kitto's "evolving story," his comments to Kelly, and the accidental voicemail he left for Kelly, addressing the possibility of fleeing the country. In comparing the expert testimony, the state also argued that the prosecution presented the "more reasonable" explanation for D.H.'s injury that resulted in death, discounting the defense theory of a "freak accident situation." Additionally, the state characterized D.H.'s death as resulting from a "beating until his heart stops," without referencing evidence in the record to support this manner of death theory.

{¶ 42} In the defense's closing argument, Kitto's trial counsel emphasized Kitto's integration in D.H.'s family life, noting Kelly testified that she had no qualms about leaving her children in Kitto's care and Kitto was active in D.H.'s life "with school, doctors, especially playing around the house." Kitto's counsel urged the jury to consider Kitto's demeanor on the offices' body camera video as he reported the accident to police, arguing Kitto was distraught and reacting as anyone would when a loved one is hurt.

{¶ 43} Counsel also addressed Dr. Schlievert's testimony, noting Schlievert relied on inaccurate facts and, after acknowledging that there was no single injury that was dispositive of abuse, he maintained that retinal detachment was consistent with abuse. Additionally, despite Schlievert relying on the Maguire study which did not support retinal injury as unique to abuse, Schlievert emphasized the retinal detachment in his findings and the state presented retinal detachment as evidence of abuse. Kitto's trial counsel argued that Schlievert's expert opinion was neither scientifically sound nor credible. Furthermore, based on the alternative theory presented regarding the mechanism

20.

of injury, Kitto's counsel argued that there was reasonable doubt regarding Kitto's culpability.

{¶ 44} The state, in its final closing, criticized the lack of cross-examination of Dr. Schlievert by Kitto's trial counsel in final closing. The state challenged Kitto's criticism of Dr. Schlievert's opinion, stating,

> Randall Schlievert, you heard him talk about how his testimony just doesn't make sense, but why didn't he talk to him on the stand? Why didn't he ask him those questions, because he knew that what Dr. Schlievert, a professional abuse specialist, would say in return. That this is tell-tale abuse.

The state characterized the failure to cross-examine as a "common tactic of counsel, specifically defense counsel, to say, well, this witness who is really good for the State didn't do certain things" and then attack that witness in closing argument. The state also argued that Kitto's trial counsel wanted to "focus on things that pull away the guilt of his client, pull you from his guilt."

{¶ 45} The state then argued that "[e]very medical expert that testified in this trial says that [Kitto] did it. The state mischaracterized Dr. Pandey's testimony and report in closing, as follows:

> Dr. Pandey, another expert, didn't even remember everything she relied upon to make her determination. And she agreed with Dr. Blomquist. She tried to sneak in a manner of death, but she couldn't because it wasn't in her report. So she created an expert report that said I agree with the State's expert.
>
> That's it. She did not put a manner of death. When asked was it was suicide, she said no. She tried to say it was accidental, but why didn't she put that in her report? So it's not in her report, it's not for you to consider.

21.

{¶ 46} After closing argument, the trial court instructed the jury. The jury deliberated for about two hours before returning a verdict of guilty as to all counts and the trial court imposed a sentence of life in prison without the eligibility for parole.

{¶ 47} Kitto filed a timely appeal of the trial court's judgment.

### III. Assignments of Error

{¶ 48} Kitto raises the following as assignments of error and issues in his appeal.

1. The trial court improperly excluded defense expert Keith Findley
   a. Mr. Findley's testimony was admissible
   b. The trial court abused its discretion by declining to modify Crim.R. 16(K)'s deadline
   c. The trial court abused its discretion by declining to continue the case
   d. Crim.R. 16(K) is unconstitutional as applied to this case.

2. The trial court improperly restricted cross-examination of an expert witness
   Mr. Kitto's right to confrontation was violated when the trial court improperly limited defense counsel's cross-examination of Dr. Schlievert

3. The state's expert witnesses improperly testified that the injuries were the result of "abusive head trauma"
   It is plain error for an expert witness to use the diagnostic term "abusive head trauma"

4. The prosecution's improper remarks during closing arguments deprived Mr. Kitto of his right to a fair trial
   e. Prosecutors improperly instructed the jury to ignore Dr. Pandey's testimony
   f. Prosecutors distorted the burden of proof

5. The jury's verdict was based on insufficient evidence
   The evidence is insufficient where it is inconsistent with the State's theory

22.

6. The jury's verdict was against the manifest weight of the evidence
   The jury's verdict is against the manifest weight of the evidence
   where the evidence is inconsistent with the State's theory

7. Cumulative error deprived Mr. Kitto of his right to a fair trial
   The cumulative effect of multiple errors – even if individually
   harmless – combined to deprive Mr. Kitto of his right to a fair trial

{¶ 49} For ease of discussion, we address some assignments of error together, and consider the issues raised by Kitto out of order.

## IV. Analysis

### A. Sufficiency

{¶ 50} In Kitto's fifth assignment of error, he argues the verdict was based on insufficient evidence. In considering sufficiency, we consider all evidence admitted by the trial court, regardless of admissibility challenges. *See State v. Roberts,* 2023-Ohio-142, ¶ 39 (6th Dist.), citing *State v. Yarbrough,* 2002-Ohio-2126, ¶ 80. We address this assignment of error first because reversal based solely on insufficient evidence acts as an acquittal, barring retrial. *Tibbs v. Florida,* 457 U.S. 31, 47 (1982); *see also State v. Brooks,* 2023-Ohio-2978, ¶ 32 (6th Dist.).

{¶ 51} Sufficiency is determined as a matter of law, and concerns adequacy of the evidence to sustain a conviction as to all elements of the offense. *State v. Thompkins,* 78 Ohio St.3d 380, 386-387 (1997). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs,* at 45 (additional citation omitted.). "To determine whether a conviction is supported by sufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most

23.

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" (Citation omitted) *State v. Walker,* 2016-Ohio-8295, ¶ 12

{¶ 52} The jury found Kitto guilty on multiple counts, and following merger, the trial court entered conviction on two counts, aggravated murder in violation of R.C. 2903.01(C), an unclassified felony, and endangering children in violation of R.C. 2919.22(B)(1), a felony of the second degree. The elements of these offenses are as follows:

> Aggravated murder. No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

R.C. 2903.01(C)

> Endangering children. No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:
> Abuse the child

R.C. 2919.22(B)(1)

{¶ 53} In challenging the sufficiency of the evidence to support conviction, Kitto argues that the evidence did not match the state's theory of the crime because the state argued the offenses occurred during a three-hour window, but the evidence demonstrated injury to D.H. in different stages of healing, with some injuries potentially two or three days old. Kitto argues that the sufficiency inquiry demonstrates no evidence to support a finding that Kitto harmed D.H., requiring reversal of the convictions.

24.

{¶ 54} While asserting the lack of evidence demonstrating Kitto injured D.H., Kitto acknowledges Kelly's testimony that she observed no injury on D.H. the night before the incident. Kitto also does not assert that D.H. experienced *no* injury during the time Kitto was alone with D.H., arguing instead that some injuries occurred prior to the time of the incident.

{¶ 55} The sufficiency standard requires reviewing all the evidence to determine whether any jury could have found the essential elements of the crime established beyond a reasonable doubt. (Citation omitted) *State v. Bies,* 74 Ohio St.3d 320, 324 (1996).

{¶ 56} Viewing the evidence most favorably for the prosecution, the state presented medical evidence of the serious injury sustained by D.H., along with evidence demonstrating Kitto had sole custody of D.H. prior to D.H. exhibiting signs of serious physical harm. The state also presented medical testimony, identifying the time of injury based on D.H.'s condition prior to death, and based on the coroner's conclusions after death. We have previously found medical evidence, combined with evidence establishing a defendant's sole custody of the child prior to exhibiting serious injury, to be sufficient to sustain conviction. *See State v. Walker,* 2020-Ohio-839, ¶ 57 (6th Dist.) (finding circumstantial evidence of injury and sole custody of the abused child sufficient).

{¶ 57} The sufficiency standard requires examination of "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilty beyond a reasonable doubt." (Citations omitted) *State v. McFarland,* 2020-Ohio-3343, ¶ 24. Kitto's argument relative to sufficiency requires

25.

disbelief of certain evidence admitted at trial. Accordingly, we find Kitto's fifth assignment of error, challenging the sufficiency of the evidence, not well-taken.

**B. Manifest Weight**

{¶ 58} In his sixth assignment of error, Kitto argues the jury's verdict was against the manifest weight of the evidence. A manifest weight determination requires an appellate court to sit as a "thirteenth juror," and review the record, weighing the evidence and all reasonable inferences, and consider the credibility of witnesses in determining whether the jury lost its way in resolving conflicts in the evidence, creating such a miscarriage of justice that reversal and a new trial is required. *See Thompkins,* 78 Ohio St.3d at 387-388. Applying this standard, a new trial should be granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 59} In support of his argument that the jury clearly lost its way in convicting him, Kitto relies on "all the reasons stated" relative to sufficiency of the evidence. Kitto further argues that the manifest weight determination includes Kitto's evidence, which demonstrated Kitto was a "nonviolent man utterly incapable of killing a child." This argument does not address the state's evidence that demonstrated D.H. was alone with Kitto when D.H. sustained serious, life-ending injury, as supported by medical testimony and evidence.

{¶ 60} Accordingly, upon review of the record, we do not find this case to be the exceptional case in which the evidence weighs heavily against conviction. Kitto's sixth assignment of error, therefore, is not well-taken.

26.

**C. Closing Argument**

{¶ 61} In his fourth assignment of error, Kitto argues that the prosecution made improper remarks during closing argument, instructing the jury to ignore Dr. Pandey's expert testimony and stating the applicable burden of proof as a "more reasonable" determination in comparing the state's theory of abuse against Kitto's theory of a freak accident, rather than the applicable "reasonable doubt" standard that applied. Because addressing this assignment of error requires consideration of the underlying testimony of Dr. Pandey, we begin with that testimony

{¶ 62} Dr. Pandey provided her expert testimony through recorded deposition, which was then played for the jury during trial without redactions. Thus, the jury viewed the testimony with objections, argument of counsel, and the trial court's rulings.

{¶ 63} The state challenged Dr. Pandey's expert opinion, indicating that she could not ascertain the manner of death, disagreeing with the coroner's conclusion of "abusive head trauma" as the manner of death. The state objected to this opinion as beyond the scope of Dr. Pandey's written report, and on appeal, argues that Pandey agreed with the cause of death findings of the coroner, Dr. Blomquist, but "[h]er report did not state a manner of death." In response, the defense argued that Dr. Pandey's testimony was consistent with her written report, in which Dr. Pandey concluded:

> Upon review of the case, the significant documented antemortem radiologic and postmortem autopsy injuries were traumatic brain injury with right subdural hemorrhage, subarachnoid hemorrhage, left parietal and temporal scalp hematoma, dislocation at atlanto occipital, atlanto axial joints with hemorrhage in the surrounding upper cervical nerve roots and bilateral retinal hemorrhages. There were no fractures of the skull, or facial bones.

27.

Based on the above review of the documentation available to Dr. Pandey it ***could not be ascertained accurately how the injuries occurred*** which resulted in blunt force trauma to the deceased. It is her opinion that [D.H.] died of blunt force trauma to head and neck.

Defense Exhibit H-I. (Emphasis added).

{¶ 64} Despite the recording and transcript, the state disputes the content of Dr. Pandey's testimony as to the manner of death determination. The state argues that Dr. Pandey agreed with Dr. Blomquist's conclusions and omitted a manner of death finding. Kitto argues that Dr. Pandey agreed with Dr. Blomquist's cause of death determination but also noted her conclusion that the manner of death "could not be ascertained accurately[.]" Throughout the testimony, the state repeatedly objected to Dr. Pandey offering opinion beyond the scope of her report, seeking to prevent her testimony regarding the manner of death in its entirety based on application of Crim.R. 16(K).

{¶ 65} The purpose of Crim.R. 16(K) is to avoid "trial-by-ambush" scenarios, *State v. Walls,* 2018-Ohio-329, ¶ 39 (6th Dist.). Thus, disclosure of expert reports prevents unfair surprise and gives the opposing party an opportunity to challenge the expert's findings, "possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." *State v. Boaston,* 2020-Ohio-1061, ¶ 48, quoting *State v. Fetty,* 2012-Ohio-6126, ¶ 36 (11th Dist.), quoting *State v. Perry,* 2012-Ohio-4888, ¶ 55 (11th Dist.). "'Surprise' occurs when a witness' testimony materially differs from a prior statement and counsel had no reason to believe that the

witness would testify as [he or she] did at trial." (Citations omitted) *State v. McKelton,* 2016-Ohio-5735, ¶ 120.

{¶ 66} Here, the state demanded that expert testimony mirror the written report, and the trial court agreed, excluding any testimony that did not mimic the writing. In challenging admissibility, the state construed Crim.R. 16(K)'s requirements narrowly, relying on *Boaston,* 2020-Ohio-1061. However, in wielding Crim.R. 16 in this manner, the state interjected gamesmanship into the discovery of the topics of expert testimony, in contravention of the purpose of the criminal rules, "to eliminate any elements of gamesmanship from a criminal proceeding." *State v. Breedlove,* 2013-Ohio-4425, ¶ 32 (11th Dist.), citing *State v. Darmond,* 2013-Ohio-966, ¶ 19, citing *Lakewood v. Papadelis,* 32 Ohio St.3d 1 (1987).

{¶ 67} In *Boaston,* the Ohio Supreme Court addressed changes to Crim.R. 16 and noted the purpose of those changes were meant "in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial." *Boaston* at ¶ 44. "The new Crim.R.16 promoted 'more open discovery,' leveling the playing field by strengthening the defendant's right to know the evidence the state will present against him at trial." *Id.,* quoting Grove, *Criminal Discovery in Ohio: "Civilizing" Criminal Rule 16,* 36 U.Dayton L.Rev. 143, 144-145 (2011). The issue in *Boaston* addressed topics beyond the scope of the expert's report, rather than testimony within the topics, stated differently from the written report. While *Boaston* addressed compliance with Crim.R. 16(K) in terms of issues and topics, the trial court supported the state's narrow

29.

interpretation of *Boaston,* to Kitto's detriment, and excluded testimony regarding issues and topics referenced within the report as "beyond the scope," where the expert varied from the exact wording used in the report or attempted to reference and explain studies cited in their report.

{¶ 68} Despite this limitation placed by the trial court, Kitto's trial counsel elicited the following testimony on direct examination:

> Q. You indicated that both the neurosurgery documents as well as the EMS reports stated that [D.H.] was running, hit his head in the front and then back again on the floor. Anatomically, does what you viewed fit that description?
>
> A. It can be consistent with that, yes.
>
> Q. Okay. So doctor, in your expert opinion, within a reasonable degree of forensic pathological certainty, what was [D.H.'s] cause of death?
>
> A. [D.H.'s] cause of death was blunt force trauma to head and neck.
>
> Q. The same as what Dr. Blomquist found, correct?
>
> A. Yes.
>
> Q. All right. And in your expert medical opinion within a reasonable degree of forensic pathological certainty, what was [D.H.'s] manner of death?
>
> A. So in my opinion it was undetermined.
>
> Q. And that is different than what Dr. Blomquist found; is that correct?
>
> A. That's correct.
>
> [Defense Counsel]: I have no further questions at this time, your Honor.

30.

The Court: Cross examination, Mr. [Prosecutor].

[Prosecutor]: Thank you, judge.
Judge, with respect to the last question and answer, I would object. It's not part of Dr. Pandey's report with respect to the manner of death. She's speaking outside the realm of her report. She's did not issue a manner of death. She does not indicate it is undetermined. So I would ask that that last answer be stricken from the record.

The Court: Any objection?

[Defense Counsel]: Your honor, she is simply stating why it is not included in her report. She is not indicating anything outside her report as to why she's issued a cause of death but not a manner of death in this instance.

[Prosecutor]: Judge, as this court well knows and as does counsel, that if it's not included in the expert report that's been presented to the opposing side, it can't be introduced here at trial.

The Court: The witness' last comments about the manner of death will be stricken from the record.

{¶ 69} After having the "undetermined" finding stricken from the testimony, the state emphasized Dr. Pandey's finding that the manner of death could not be determined in its cross-examination. The state questioned Dr. Pandey on all the possible manners of death, based on the available information. The state questioned whether Dr. Pandey's report indicated she did not "necessarily believe" Kitto's claim that D.H. ran into a door or wall, followed by a fall to the floor. Dr. Pandey responded, "no, that's not correct." The state then highlighted Dr. Pandey's undetermined finding, in the following exchange:

Q.      Well, the defendant said he ran into a door or a wall and your expert opinion indicates it could not be ascertained accurately how the injuries occurred so you don't know what happened, do you?

31.

A.     That's correct.

Q.     Because with respect to those reports, are you aware that [D.H.] was at home and the only other person at home was the defendant?

A.     Yes.

The state ended cross-examination by asking Dr. Pandey regarding her opinion

concerning the manner of death, as follows:

Q.     So you talked about different manners, there's natural, correct?

A.     Yes.

Q.     Accidental?

A.     Yes.

Q.     Suicide?

A.     Yes.

Q.     Non-accidental?

A.     Um, so it's undetermined.

Q.     So where does homicide fall in there?

A.     There's homicide as well.

Q.     Very good. This was not a suicide, correct?

A.     No.

Q.     And how do you know that?

A.     I don't.

Q.     Is this a natural death?

A.      No.

Q.      Why not?

A.      Because the child had evidence of blunt force trauma.

Q.      So in your finding, you indicate based on the review and documentation available, it could not be ascertained accurately how the injuries occurred which resulted in blunt force trauma to the deceased. So [D.H.] died from blunt force trauma to his head?

A.      Head and neck, yes.

As a final question, the state asked Dr. Pandey if the manner of death could be homicide. Dr. Pandey responded affirmatively.

On redirect, Kitto's trial counsel questioned Dr. Pandey based on the cross-examination as follows:

Q.      … [the prosecutor] started asking you questions about manner of death. And you went through the different possibilities. Your report does not indicate a manner of death; is that correct?

A.      That's correct.

Q.      Why is that?

A.      Um, because, um, I could not ascertain accurately what it could be.

Q.      Okay. And is there a manner of death that most commonly fits that situation?

A.      Yes.

Q.      And what would that be?

A.      That's undetermined.
…
Q.      Could it have been accidental?

A.    Yes.

{¶ 70} The state then objected to testimony regarding possible manners of death, with the following argued by counsel:

> [Defense Counsel]:  Judge, the State got to go through various causes of death and ask this witness the same opinion. Defense would like the same leeway to do the same. The State opened the door for that, Judge.
>
> [Prosecutor]: Judge, her report has been authored and presented as an exhibit. If counsel intends to ask her a bunch of questions about what's not in her report, that's the objection. That's the rule. We know that you can't opine further than what is included in your report, per *State v. Boaston.*

{¶ 71} The trial court permitted "limited" questioning and did not strike any of the manner of death testimony on redirect. Dr. Pandey also testified concerning D.H.'s history of prior head injury after D.H. ran into something or fell and injured himself. On recross, Dr. Pandey testified that D.H.'s prior injury was not serious, and she also acknowledged that typical activity of a 3-year-old does not usually result in the type of injury D.H. sustained in this case.

{¶ 72} Despite this record, in closing argument, the state mischaracterized Dr. Pandey's testimony and report, as follows:

> Dr. Pandey, another expert, didn't even remember everything she relied upon to make her determination. And she agreed with Dr. Blomquist. She tried to sneak in a manner of death, but she couldn't because it wasn't in her report. So she created an expert report that said I agree with the State's expert.
>
> That's it. She did not put a manner of death. When asked was it was suicide, she said no. She tried to say it was accidental, but why didn't she put that in her report? So it's not in her report, it's not for you to consider.

34.

Kitto's defense counsel did not object during the State's mischaracterization, which occurred during the state's final closing argument. Thus, Kitto has waived all but plain error.

{¶ 73} While a prosecutor has wide latitude in closing argument, and may comment on inferences drawn from the evidence introduced at trial, the prosecution must "avoid insinuations and assertions which are calculated to mislead the jury;" must not "express his personal belief of opinion as to the credibility of a witness or as to the guilt of the accused;" is not to "allude to matters which will not be supported by admissible evidence;" and should not "make unfair or derogatory personal reference to opposing counsel." *State v. Coleman,* 2016-Ohio-7335, ¶ 40 (6th Dist.), quoting *State v. Smith,* 14 Ohio St.3d 13, 14 (1984). "Since isolated instances of prosecutorial misconduct are generally harmless, any alleged misconduct in the closing argument must be viewed within the context of the entire trial to determine if any prejudice has occurred." *State v. Conner*, 2010-Ohio-6500, ¶ 28 (6th Dist.).

{¶ 74} Kitto challenges the mischaracterization of Dr. Pandey's testimony, claiming the state instructed the jury to disregard Dr. Pandey's expert opinion. Additionally, Kitto argues that the state argued an improper burden of proof, stating a "more reasonable" determination in comparing the state's theory of abuse against Kitto's theory of a freak accident, rather than the applicable "reasonable doubt" standard that applied to the jury's consideration of the state's case. We address each argument in turn.

35.

{¶ 75} Here, the statements in closing argument are a clear mischaracterization of Dr. Pandey's testimony. Dr. Pandey agreed with the coroner as to the cause of death, but also clearly disagreed as to the manner of death. Dr. Pandey opined that the manner of death could not be determined, which was consistent with the conclusion in her expert report, that "how" D.H. was injured could not be "ascertained." Thus, the state's position in closing argument did not accurately portray the record.

{¶ 76} Furthermore, the state's argument regarding a "more reasonable" theory of the manner of death implicated the applicable burden of proof, as argued by the state. Pursuant to R.C. 2901.05, an accused is "presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution." Reasonable doubt "is not mere possible doubt" but requires "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E).

{¶ 77} In this case, Kitto objects only to the prosecutor's statements in closing argument, with no claim that the trial court gave an incorrect jury instruction regarding the evidence that must be considered or the state's burden of proof. Therefore, the improper comments during closing arguments were remedied by the trial court's instruction to the jury. *State v. Powell,* 2012-Ohio-2577, ¶ 154, citing *State v. Garner,* 74 Ohio St.3d 49, 59 (1995).

{¶ 78} The trial court instructed the jury and specifically stated that statements made during closing arguments are not evidence. The trial court, furthermore, properly

36.

instructed the jury on the state's burden of proof. We presume the jury followed the trial court's instructions on the applicable law. *Pang v. Minch,* 53 Ohio St.3d 186 (1990), paragraph four of the syllabus.

{¶ 79} Thus, despite the misapplication of Crim.R. 16(K) by the state and trial court that the state used to mischaracterize Dr. Pandey's opinion in closing argument, the error as framed by Kitto does not demonstrate reversible error. Accordingly, we find Kitto's fourth assignment of error not well-taken.

### D. Admissibility of Expert Testimony

{¶ 80} Kitto's first, second, and third assignments of error concern admission of expert testimony. In his first assignment of error, Kitto argues the trial court committed error in applying Crim.R. 16(K) to exclude defense expert Professor Keith Findley, offered to counter Dr. Schlievert's testimony by challenging Dr. Schlievert's methodology. In his second assignment of error, Kitto argues the trial court improperly restricted his cross-examination of the state's expert, Dr. Schlievert, violating his right to confrontation. Finally, in his third assignment of error, Kitto argues that the use of the term, "abusive head trauma" by the state's expert witnesses was improper and constituted plain error.

{¶ 81} Expert testimony is admissible under Evid.R. 702, permitting an expert to testify regarding matters "beyond the knowledge or experience possessed by lay persons" or to address "a misconception common among lay persons," and must be based on "specialized knowledge, skill, experience, training, or education regarding the subject

37.

matter of the testimony." Evid.R. 702(A)-(B). Evid.R. 702(C) addresses the reliability of an expert's opinion and requires inquiry "on whether the principles and methods… employed to reach [the] opinion are reliable," and the expert testimony must "assist the trier of fact in determining a fact issue or understanding the evidence." *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 610-611 (1998).

{¶ 82} In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the United States Supreme Court set forth a test for reliability of expert testimony, requiring consideration of whether the reasoning or methodology underlying the testimony has scientific validity. *Miller* at 611, citing *Daubert* at 592-593. In applying the *Daubert* test to determinations of admissibility under Evid.R. 702(C), Ohio courts consider "whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." (Citations omitted) *Miller* at 613-614.

### 1. Abusive Head Trauma

{¶ 83} Expert testimony was an important part of both the state's and Kitto's cases, considering the state's theory of "abusive head trauma" was central in demonstrating, beyond a reasonable doubt, that Kitto committed aggravated murder and child endangering. Kitto's third assignment of error challenges the admission of the term, "abusive head trauma," as part of the expert testimony at trial.

{¶ 84} The science of "abusive head trauma," formerly known as "shaken baby syndrome" or "SBS," has been routinely introduced through expert testimony to explain

38.

the type of brain injury exhibited by D.H., in the absence of outward signs of serious injury or a high-velocity event. *See, e.g., State v. Grad,* 2024-Ohio-5710, ¶ 56-60 (lead opinion) (outlining the history of SBS in the courts). In cases in which the defense presented expert testimony that countered the mainstream diagnosis of abusive head trauma or SBS, the prosecution could argue that such opinion was not generally accepted by pediatricians and contrary to "what has been taught in medical schools," diminishing any weight given to the defense expert's testimony. *State v. Butts,* 2023-Ohio-2670, ¶ 38-39 (10th Dist.). The science of abusive head trauma/SBS, however, continued to evolve since first being introduced as a theory to secure criminal convictions in the 1980s. (Citation omitted) *Grad,* 2024-Ohio-5710, ¶ 56-60.

{¶ 85} The central hypothesis in diagnosing abusive head trauma/SBS once firmly rested on a triad of dispositive symptoms: brain injury, subdural hematoma, and retinal hemorrhage. *Grad* at ¶ 59; *Butts* at ¶ 46. These injuries, together, were "treated as abuse unless definitively proven otherwise." *Butts* at ¶ 46. In the late 2000s, research demonstrated that abusive head trauma might have a cause other than the presumed abuse, and in 2009 the American Academy of Pediatrics (AAP) revised its guidance to medical providers to consider "alternative hypotheses and all clinical data before making a medical diagnosis of SBS" for patients exhibiting the triad of symptoms. *Butts* at ¶ 49. By 2018, the AAP repudiated the presumption of abusive head trauma/SBS in the absence of a high-velocity event and, instead, advised the exclusion of medical disease

that might mimic abusive head trauma and alternative diagnoses before considering abusive head trauma as a diagnosis. *Butts* at ¶ 50.

{¶ 86} Thus, a consensus has emerged from within the scientific community that the triad of symptoms might also result from an accident. *Grad* at ¶ 59. Based on the "changes in the scientific community's understanding of the triad, numerous courts have vacated convictions based on [abusive head trauma]" or granted hearing on the new science as newly discovered evidence in postconviction proceedings. *Grad* at ¶ 59, citing *Commonwealth v. Epps,* 474 Mass. 743, 768-769, 53 N.E.3d 127 (2016); *State v. Edmunds,* 308 Wis.2d 374, 2008 WI App.33, 746 N.W.2d 590, ¶ 23; *see also Butts,* 2023-Ohio-2670 (10th Dist.) (granting a delayed motion for new trial based on new scientific evidence challenging the reliability of diagnosis based on the triad of symptoms).

{¶ 87} Considering this historical framework and the acceptance of the diagnosis of abusive head trauma among Ohio courts, we find no merit in Kitto's argument that the use of the term by witnesses during trial was prejudicial, requiring reversal based on plain error. While Kitto might have challenged the use of the term and argued undue prejudice under Evid.R. 403(A) grounds, citing the changing consensus within the scientific community, he did not do so and must instead demonstrate plain error.

{¶ 88} "A finding of plain error is three-fold, requiring (1) an error or deviation from law, (2) that the error is plain, or an obvious defect in the proceedings, and (3) that the error affected 'substantial rights,' altering the outcome of the trial." *State v. Jones,* 2019-Ohio-3704, ¶ 21 (6th Dist.), citing *State v. Payne,* 2007-Ohio-4642, ¶ 16 (additional

40.

citation omitted.). In this instance, the error Kitto argues relates to an established but potentially vulnerable concept, poised for challenge based on new scientific consensus. Therefore, there is no obvious error, properly addressed as plain error, but only argument of a possibly outdated practice in Ohio courts concerning the use of the term, abusive head trauma.[3] This is perhaps best illustrated by the fact that Kitto relies on Michigan case law finding the term prejudicial to challenge the term, while acknowledging no Ohio precedent that would preclude the term's use.

{¶ 89} Accordingly, we find no basis to assign plain error to the expert testimony referencing a generally accepted medical diagnosis, and Kitto's third assignment of error is not well-taken.

## 2. Professor Findley's Expert Testimony

{¶ 90} In his first assignment of error, Kitto challenges the trial court's exclusion of Professor Keith Findley's testimony. Kitto argues that Findley's testimony was admissible, that the trial court abused its discretion in declining to modify the 21-day deadline, that the trial court abused its discretion in declining to continue the case, and that Crim.R. 16(K) is unconstitutional as applied to the facts of his case.

{¶ 91} The decision to admit or exclude evidence lies within the trial court's broad discretion, "and a reviewing court should not disturb evidentiary decisions in the absence

---

[3] The court makes no legal finding regarding the propriety of the term, abusive head trauma, but merely recognizes that the concept is an evolving one among scientists. Any change to the law in this regard should not result from plain error review in an appeal as a matter of first impression.

41.

of an abuse of discretion that has created material prejudice." *State v. Kamer,* 2022-Ohio-2070, ¶ 98 (6th Dist.), quoting *State v. Conway,* 2006-Ohio-2815, ¶ 62 (additional citation omitted.). A court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *State v. Urbanek,* 2023-Ohio-2249, ¶ 63 (6th Dist.), citing *Estate of Johnson v. Randall Smith, Inc.,* 2013-Ohio-1507, ¶ 22 (additional citation omitted.). Where the trial court's decision is based on "misapplication of the law to undisputed facts," we have found abuse of discretion. *See State v. Huebner,* 2023-Ohio-2803, ¶ 82 (6th Dist.) (trial court abused its discretion in applying an incorrect standard of "definitiveness" to expert testimony).

{¶ 92} Kitto sought to counter the state's witnesses who concluded the manner of death was abusive head trauma, with his own experts that included Professor Findley. The state's primary challenge to admission of Professor Findley was based on the procedural requirements under Crim.R. 16(K).[4] The state argued strict time requirements for expert reports under Crim.R. 16(K), with the Rule stating:

> (K) Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the

---

[4] While the state included additional argument that Professor Findley was not a medical doctor and therefore not qualified, there was no request for a *Daubert* hearing and the defense argued limitation of Findley's testimony to documenting the error rate of abuse diagnoses, focusing on studies utilizing Dr. Schlievert's methodology. Also, the trial court, in its ruling, specifically declined to address this argument, relying solely on the procedural requirements of Crim.R. 16(K).

42.

written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 93} The state argued that Kitto's attempt to email the expert report before the 21-day deadline failed, and Kitto's trial counsel was informed of the failed email and provided the report a week too late. The representations of counsel, however, demonstrated an attempt to transmit the expert report by email within the time permitted, the state's communication with Kitto's counsel shortly after the email and notice of production, the state's email stating matters could wait until Kitto's counsel returned from vacation, and prompt production of the expert report 14 days prior to trial upon learning the email was never received.

{¶ 94} The trial court determined Kitto's failure to adhere to the 21-day requirement mandated exclusion of Findley as a witness, relying on *State v. Boaston,* 2020-Ohio-1061. Considering the record relative to production under Crim.R. 16(K), the trial court found the law of *Boaston* greatly limited discretion in modifying the time requirements and equated an untimely production of the expert report as no production at all, requiring exclusion. The trial court did not address the admissibility of Findley's testimony, providing only a procedural ruling.

{¶ 95} The trial court's interpretation of Crim.R. 16(K) and *Boaston* was inconsistent with the law. The Rule expressly grants courts discretion to modify the 21-day requirement for good cause. The trial court determined it had very limited discretion and found no reason to modify the deadline because Kitto's trial counsel did not ensure receipt in attempting to email the expert report and thus produced it one week late,

43.

referencing a lack of good cause based on counsel's failed email attempt. In other words, the trial court found no good cause to permit production one week later because Kitto was one week late in producing his expert report. The trial court also refused to entertain a continuance and made no finding as to prejudice to the state.[5]

{¶ 96} In applying *Boaston,* the trial court also ignored the factual differences with Kitto's case. The issue in *Boaston* concerned expert testimony during trial that addressed new theories regarding time-of-death and the origin of one of the victim's wounds, without the expert first setting forth this new opinion in a written report. *Boaston,* 2020-Ohio-1061, ¶ 56. The report the state provided in *Boaston*, authored by the state's expert, Dr. Scala-Barnett, did not include an opinion regarding the time of death based on stomach contents and regarding a "glove-buckle comparison" to explain a bruise or mark left on the victim's chin as caused evidence taken from the defendant. *Id.* In finding reversible error, the Ohio Supreme Court determined these opinions "should have been set forth in a report or supplemental report pursuant to Crim.R. 16(K)" to provide "formal notice of this substantive opinion testimony" so the defense had an opportunity to "seek other expert testimony on these issues." *Id.* at ¶ 57.

{¶ 97} Unlike the case in *Boaston,* Kitto's trial counsel provided an expert report outlining Professor Findley's opinion regarding his expert testimony. Rather than lack of

---

[5] The state limited argument of prejudice to the potential need to obtain an expert to address Professor Findley's challenge to Dr. Schlievert, characterized by the state as a "fact witness." The state also argued that Professor Findley's testimony would confuse the issues by permitting an historian or authoritarian to "talk about the law and where it comes from" to state disagreement with Dr. Schlievert's diagnosis.

44.

notice, the issue was late notice due to undelivered email, promptly remedied by the defense once the state informed Kitto's trial counsel of failed receipt. Professor Findley, moreover, would have testified on a narrow issue related to Dr. Schlievert's methodology as a specialist in child abuse, and error rates in abuse determinations utilizing this methodology. Thus, Kitto's expert would not have introduced a new area of substantive testimony but would have testified only to counter Dr. Schlievert's testimony by questioning his methodology.

{¶ 98} In determining Kitto's late production of the expert report could not be addressed through modification of the 21-day period for "good cause shown" because late production was not "good cause" under the Rule, the trial court essentially excised the "good cause" modification language from Crim.R. 16(K) in favor of mandating exclusion. However, the Rule did not require this remedy. The trial court could have modified the time requirement or granted the requested continuance, as a new trial date would have brought the untimely production of the report within the deadline. *See, e.g., State v. Bellamy,* 2022-Ohio-3698, ¶ 13 (finding the state's failure to timely produce its expert report to the defense did not bar testimony by the expert in a new trial, as disclosure fell within the time requirement under Crim.R. 16(K) for the retrial).

{¶ 99} In a similar case, the state's failure to deliver the expert report within the deadline for its DNA analyst was remedied by a brief continuance. In *State v. Harris,* 2024-Ohio-3388 (5th Dist.), the Fifth District found no abuse of discretion in granting a continuance, finding the trial court properly weighed "good cause," noting:

45.

When the prosecutor learned Appellant had not received the expert report, she quickly rectified the situation and provided defense counsel with the report on September 12, 2023. The trial court continued the matter until October 2, 2023, 21 days (including October 2nd) from the day defense counsel received the report. Even if October 2nd is not included in the 21-day calculation, Crim.R . 16(K) provides the 21-day period "may be modified by the court for good cause shown, which does not prejudice any other party." Crim.R. 16(K). We find the trial court balanced Appellant's constitutional right to a speedy trial and compliance with the rule by imposing the least severe sanction for the State's unwilful discovery violation.

*Harris* at ¶ 34.

{¶ 100} Considering the circumstances in Kitto's case, the trial court erred in its belief that it had little discretion to remedy the late production of Professor Findley's expert report, based on Crim.R. 16(K). Furthermore, the only consideration of continuance, on the record, focused on the number of continuances already granted to the defense and the trial court's own calendar, with no balancing of Kitto's rights in considering the least severe sanction that complied with Crim.R. 16(K).[6]

{¶ 101} The state's argument regarding prejudice, moreover, is stated in hypothetical terms, asserting only the possibility that the state might wish to obtain its own expert to rebut Professor Findley's conclusions. The record demonstrates the state had notice of the defense's intent to call Professor Findley as a witness, based on the

---

[6] The state emphasizes the 10 prior continuances granted by the trial court. The record demonstrates the trial court scheduled the first trial 2 months after Kitto's October 19, 2022 arraignment, and the first nine trial dates were all within a year of arraignment. The tenth trial date, February 27, 2024, was continued five months to July 16, 2024, to accommodate the schedule of the court, the attorneys, and the witnesses. Kitto executed a waiver of his speedy trial rights and there were no "speedy trial" concerns raised.

46.

notice of discovery filed by Kitto on June 24, 2024, and the record contains no representations by the state concerning the time needed to obtain an expert. Instead, the state argued that having only two weeks to review the expert report infringed on their trial preparation time.[7]

{¶ 102} Considering the record, the trial court did not consider good cause as contemplated under the Rule, but instead construed Crim.R. 16(K) as not permitting modification of the time where the defendant failed to produce a report within the time based on failure of receipt, an interpretation that nullifies the provision for time modification within the Rule. Accordingly, the trial court committed error in excluding Professor Findley's expert testimony based solely on this misapplication of the procedural requirements of Crim.R. 16(K), and in limiting its determination to the procedural considerations, the trial court failed to properly address whether modification of the expert report deadline, continuance of the trial, or any other remedy was appropriate.

{¶ 103} Kitto also argues that Professor Findley's testimony was admissible. Because the trial court did not consider admissibility based on substantive grounds and refused Kitto's proffer of testimony into the record, there is little in the record to resolve

---

[7] Kitto also noted that he complied with Crim.R.16(K) by disclosing Professor Findley by notice and by emailing the expert report, despite the state's claim of failed email. Because Kitto does not raise the issue of a timely *attempt* as disclosure under the Rule, we do not address the issue on appeal.

47.

this issue on appeal.[8] The record demonstrated that Professor Findley's expertise concerned error rates in abuse determinations.

{¶ 104} The state argued that expert testimony to counter Dr. Schlievert's opinion regarding abuse required a state expert in rebuttal, because Dr. Schlievert testified as a fact witness and not an expert, despite qualifying Dr. Schlievert as an expert at trial. The state further challenged Professor Findley's expertise regarding medical matters, characterizing his purported testimony as challenging Dr. Schlievert's medical diagnosis. The record provides little support to the state's position, which would permit the state's "cake and eat it too" approach on expert testimony.

{¶ 105} First, Dr. Schlievert was qualified as an expert during trial, and the state represented Dr. Schlievert as an abuse specialist and questioned Dr. Schlievert on his experience, methodology, and supporting science. A lay witness may be permitted to offer testimony in areas normally reserved for experts, such as a treating physician. *See, e.g., State v. Martin,* 2024-Ohio-5332, ¶ 80 (7th Dist.), citing *State v. McKee,* 91 Ohio St.3d 292, 296-297 (2001) (additional citation omitted); Evid.R. 701 (limiting lay opinion testimony to opinions based on witness' perceptions, helpful to understanding the witness' testimony or to determine a fact in issue). The state, however, qualified Dr.

---

[8] While not raised as a separate assignment of error, the refusal to permit a proffer is a clear abuse of discretion in this instance. *See State v. Grub,* 28 Ohio St.3d 199, 203 (1986), fn3; *see also Alselaim v. Ahreshien,* 2023-Ohio-2420, ¶ 56 (6th Dist.) (upon ruling in limine, excluding evidence, proponent must seek to proffer evidence to preserve the matter for appeal). The trial court articulated no basis for excluding the defense's proffer of testimony, and the record, likewise, contains nothing to justify refusing the proffer in this case.

48.

Schlievert as an expert, and the state provides no authority for presuming the state's expert witness was *actually* a fact witness, contrary to the trial record. Considering Dr. Schlievert's testimony ventured beyond his observations of D.H. into his specialized knowledge and methodology, we reject the state's characterization in favor of the trial record.

{¶ 106} Next, the state characterizes Professor Findley's proposed testimony as medical opinion without medical qualifications. We do not have the substance of the proposed testimony, however, because the state objected to the proffer, and the trial court sustained that objection, refusing Kitto's proffer for the record. At best, we have Professor Findley's expert report and CV, filed with his opposition to the state's motion in limine, and Kitto's and the state's representations as to the general subject of that testimony.

{¶ 107} In his report, Professor Findley outlined his credentials and experience, noting a central focus of his work in "researching the law, science, and medicine underlying Shaken Baby Syndrome, now known more generally as Abusive Head Trauma[.]" Findley indicated he has published extensively on the controversy related to scientific support for abusive head trauma as a theory in criminal prosecutions, examining the underlying hypothesis and diagnostic criteria. In addressing the methodology, Professor Findley referenced the "circularity flaw," or the inability to "conduct randomized controlled studies…comparing cases in which children were abused to those in which they suffered their injuries through natural or accidental

49.

processes." Because identifying accidental versus abusive injury "poses a nearly insurmountable problem for researchers," he opined, the default has been to place children in the abuse category, and "[e]ven ardent proponents of the [abusive head trauma] hypothesis universally acknowledge that circularity is an omnipresent confound" in the research.

{¶ 108} Professor Findley noted that, "[i]n the absence of high-quality research, child-abuse physicians default to claims that they can reliably 'diagnose' abuse through the exercise of clinical judgment." However, because the diagnosis involves little or no feedback, diagnostic errors "exist at nontrivial and sometimes alarming rates" and physicians performing the diagnosis "cannot provide a known error rate for their abuse determinations." Findley noted that some courts have excluded testimony regarding abusive head trauma, finding, "An untestable scientific theory is all theory and no science."[9]

{¶ 109} Based on the expert report, Professor Findley would have testified regarding flaws in the methodology and diagnosis used by Dr. Schlievert. Consistent with that report, Findley's testimony would have addressed the science underlying Dr. Schlievert's differential diagnosis and provided evidence concerning the rate of diagnostic error, which the jury could have weighed against Dr. Schlievert's testimony in deciding Kitto's guilt. Thus, based on the assertion that Dr. Schlievert's evidence lacked scientific support, admitting Professor Findley's testimony to challenge Dr. Schlievert's

---

[9] Findley cited to *United States v. Gissantaner,* 990 F.3d 457, 463 (6th Cir.2021).

50.

methodology may have been consistent with *Daubert,* which favors "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" in presenting evidence. *Daubert,* 509 U.S. at 597.

{¶ 110} Presuming Professor Findley's testimony would have been properly admitted, the trial court's exclusion of that testimony resulted in material prejudice to Kitto's case when viewed against the evidence admitted at trial. "Material prejudice may exist where the trial court's erroneous exclusion of evidence precludes a party from proving his or her case." (Citation omitted) *Pirock v. Crain,* 2020-Ohio-869, ¶ 95 (11th Dist.); *see also Ellis v. Fortner,* 2021-Ohio-1049, ¶ 25 (9th Dist.); *Hallworth v. Republic Steel Corp.,* 153 Ohio St. 349 (1950), paragraph three of the syllabus.

{¶ 111} Kitto's expert testimony was limited by the trial court to testimony regarding his theory of an accidental injury. The trial court limited Kitto's ability to cross-examine Dr. Schlievert on his methodology, as addressed under Kitto's second assignment of error.  Based on the record, therefore, Professor Findley's testimony regarding limitations to the methodology and significant misdiagnosis rates would have been the only evidence for the jury to consider in weighing the testimony and opinion of Dr. Schlievert, considering the trial court's limitations on cross-examination of Dr. Schlievert.

{¶ 112} Accordingly, based on the limited record before us, "we are unable to find that without the errors the fact finder would probably have reached the same decision." *Ellis* at ¶ 25. Therefore, the trial court's exclusion of Professor Findley's testimony on

51.

procedural grounds resulted in material prejudice, and we find Kitto's first assignment of error well-taken. Based on our finding, we need not address Kitto's argument that Crim.R. 16(K) is unconstitutional as applied to his case.

### 3. Dr. Sclievert's Expert Testimony

{¶ 113} In his second assignment of error, Kitto argues his right to confrontation was violated when the trial court improperly limited cross-examination of Dr. Schlievert. The state presented Dr. Schlievert as an expert on child abuse and he determined the manner of death as abusive head trauma, while also acknowledging the occasional error in his analysis. Kitto's expert, Professor Findley, would have testified to a significant (39%) misdiagnosis rate in abuse cases. In the absence of that testimony, Kitto's trial counsel attempted to question Dr. Schlievert on the rate of misdiagnosis. Because Dr. Schlievert acknowledged he sometimes made a mistake, the trial court excluded further questioning on errors, including questions based on learned treatises that addressed error rates.

{¶ 114} On appeal, Kitto challenges the trial court's limitations to his cross-examination of Schlievert as a violation of his right to confront witnesses under the Sixth Amendment to the United States Constitution. Kitto's trial counsel attempted to question Schlievert on the misdiagnosis rate by referring to published studies on the issue. Pursuant to Ohio's learned treatise exception to hearsay, a treatise may be used for impeachment purposes pursuant to Evid.R. 803(18), which provides:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination,

52.

statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

{¶ 115} The scope of cross-examination is governed by Evid.R. 611 and 616, permitting questioning "on all relevant matters and matters affecting credibility," Evid.R. 611, and probing into matters of "bias, prejudice, interest, or any motive to misrepresent[.]" Evid.R. 616(A). While a trial court has discretion over admission of testimony, "[a] defendant's right to cross-examine the state's witnesses is guaranteed by both the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution." (Citations omitted) *State v. McAlpin,* 2022-Ohio-1567, ¶ 151.

{¶ 116} Thus, a trial court may impose "reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's' safety, or interrogation that is repetitive or only marginally relevant." *Id.,* quoting *Delaware v. VanArsdall,* 475 U.S. 673, 679 (1986). To sustain a challenge based on limitations to cross-examination, Kitto must demonstrate the prohibited questions were otherwise appropriate for cross-examination. *Id.* at ¶ 152, citing *Van Arsdall* at 680. As the prohibited questions in this instance concern hearsay and the exception under Evid.R. 803(18), our review of the exclusion is de novo review under Evid.R. 803(18), and not "the more deferential review employed for discretionary rulings." (Citation omitted.) *State v. Richcreek,* 2011-Ohio-4686, ¶ 32 (6th Dist.); *see also*

53.

*State v. McKelton,* 2016-Ohio-5735, ¶ 97 (hearsay rulings that implicate the Confrontation Clause are reviewed de novo).

{¶ 117} In this case, the trial court prevented Kitto's trial counsel from questioning Dr. Schlievert regarding documented error rates in diagnosing abusive head trauma, using studies published within Dr. Schlievert's discipline, studies that Dr. Schlievert acknowledged were considered or applied by those like himself who conducted the differential diagnosis necessary to classify head trauma. Counsel asked Dr. Schlievert if he was aware of the error rate in diagnosing abusive head trauma, and Dr. Schlievert testified he did not know the error rate. Counsel then attempted to question Dr. Schlievert regarding a published study, showing a 39% misdiagnosis rate, the state objected, and the trial court sustained the objection. Based on the trial court's ruling, it deemed such questions cumulative to Dr. Schlievert's admission that he was occasionally wrong in his diagnosis, as are all doctors over the course of a career.

{¶ 118} Kitto's attempted cross-examination challenged the results of Dr. Schlievert's application of the methodology, based on the misdiagnosis rate referenced in professional literature. The error rate would go to the weight of Dr. Schlievert's opinion. *State v. Adams,* 2004-Ohio-5845, ¶ 82-84 (issues regarding methodology or error rate go to the weight of the evidence rather than admissibility). Furthermore, Evid.R. 803(18) permits use of treatises for purposes of impeachment. *Moretz v. Muakkassa,* 2013-Ohio-4656, ¶ 55. Thus, with the proper foundation, statements in the published literature may be used to impeach an expert witness. *Freshwater v. Scheidt,* 86 Ohio St.3d 260, 269

54.

(1999); *see also Armstrong v. Brown,* 2002-Ohio-6916, ¶42-43 (11th Dist.), quoting *Martin v. Elden,* 32 Ohio St. 282, 287 (1877) (reversible error to deny impeachment on cross-examination using published literature, as cross-examination to test the accuracy and credibility is "well-settled in Ohio jurisprudence.").[10]

{¶ 119} The trial court prevented impeachment based on documented error rates, or misdiagnosis of abusive head trauma, thus incorrectly equating Dr. Schlievert's admission to occasional error with actual statistics. Additionally, the trial court prevented Kitto's trial counsel from providing better foundation, to support admission of the studies, by failing to address the issue under Evid.R. 803(18) in favor of excluding the testimony as cumulative. Considering this record, the trial court erred in its ruling, and in doing so, denied Kitto his right to cross-examine Dr. Schlievert to challenge the credibility of his opinion.

{¶ 120} Having determined the trial court erred, we must next address whether that error was harmless. In addressing the issue, we must consider "whether the error was harmless beyond a reasonable doubt, 'assuming that the damaging potential of the cross-examination were fully realized.'" *Huebner,* 2023-Ohio-2803, at ¶ 134 (6th Dist.), quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986).

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material

---

[10] Both *Freshwater* and *Armstrong* reference either common law or former Evid.R. 706. The common law and former Rule are now codified at Evid.R. 803(18).

55.

points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

*Van Arsdall* at 684.

{¶ 121} Here, Dr. Schlievert was important to the state's case, not just based on his own testimony, but also because Dr. Blomquist referenced Dr. Schlievert's diagnosis in forming his own expert opinion as coroner. Dr. Schlievert's importance is especially evident, considering the state's closing argument criticizing the lack of cross-examination of Dr. Schlievert. The state argued:

> Randall Schlievert, you heard him talk about how his testimony just doesn't make sense, but why didn't he talk to him on the stand? Why didn't he ask him those questions, because he knew that what Dr. Schlievert, a professional abuse specialist, would say in return. That this is tell-tale abuse.

Considering, as an additional factor, the trial court's exclusion of Professor Findley, there was little evidence contradicting or challenging Dr. Schlievert's diagnosis. Kitto's remaining experts, Dr. Pandey and Professor Monson, provided testimony that established an alternative theory of injury, but neither witness was presented in direct challenge of Dr. Schlievert's methodology or conclusions.

{¶ 122} Considering this record, cross examination of Dr. Schlievert regarding the documented error rate of misdiagnosis of abusive head trauma was an important part of Kitto's defense. By closing off this avenue on cross-examination, the trial court prevented the jury from considering the accuracy of the diagnosis versus the defense theory of an accident. "To conclude this error was merely harmless error, we must determine the

56.

evidence of guilt was overwhelming or that the error did not contribute to the conviction." *Huebner* at ¶ 137, citing *State v. Ferguson,* 5 Ohio St.3d 160, 167 (1983), fn 5.

{¶ 123} Because the state's remaining evidence rested on Kitto's presence at the time of injury and the severity of the injury, with nothing in the record to suggest Kitto had any tendency or motive to harm D.H. or any child, we cannot find overwhelming evidence of guilt or that the error did not contribute to the conviction. Consequently, we find Kitto's second assignment of error well-taken.

**E. Cumulative Error**

{¶ 124} In his seventh and final assignment of error, Kitto argues that the cumulative effect of errors deprived him of his right to a fair trial. The cumulative error doctrine permits reversal where the "cumulative effect of errors deprives a defendant of the constitutional right to a fair trial even though each single instance of error does not individually constitute cause for reversal." *State v. Towns,* 2020-Ohio-5120, ¶ 100 (6th Dist.), citing *State v. Garner,* 74 Ohio St.3d 49 (1995), paragraph two of the syllabus.

{¶ 125} As previously addressed, we noted error in the prosecution's statements in closing argument, based on misapplication of Crim.R. 16(K) during the proceedings. We also found the exclusion of Professor Findley's testimony and the limitations to Kitto's cross-examination of Dr. Schlievert constituted reversible error. Even if these errors could be deemed harmless, the combination of multiple errors requires application of the

cumulative error doctrine to protect the substantial rights of Kitto. In sum, the cumulative effect of the trial court's errors deprived Kitto of his right to a fair trial.

{¶ 126} Because of the trial court's evidentiary rulings, the jury never heard Professor Findley's testimony, intended to challenge the accuracy of Dr. Schlievert's opinion, and Kitto was unable to challenge the accuracy of this opinion through cross-examination. Added to the state's emphasis in closing arguments regarding the lack of cross-examination of Dr. Schlievert and on the trial court's incorrect application of Crim.R. 16(K), leading to the mischaracterization of Dr. Pandey's expert conclusions, the errors in this case combined to deny Kitto a meaningful opportunity to confront a key witness of the state in its case against him regarding the manner of death.

{¶ 127} Here, the record clearly demonstrates the combined errors by the trial court prevented the jury from fully considering Dr. Schlievert's credibility and accuracy, based on the exclusion of evidence and limitations to cross-examination. Thus, the errors prevented a fair determination of Kitto's innocence or guilt by the jury, as is Kittos' right, regardless of the seriousness of the charges. *See, e.g., Huebner,* 2023-Ohio-2803, at ¶ 88 (6th Dist.), quoting *State v. Gersin,* 76 Ohio St.3d 491, 494-95 (1996) ("Even those who prey on the defenseless are entitled to a fair defense.").

{¶ 128} Accordingly, we find Kitto's seventh assignment of error well-taken.

58.

## V. Conclusion

**{¶ 129}** Finding substantial justice has not been done, we reverse the judgment of the Lucas County Court of Common Pleas, vacate the conviction, and remand the matter for a new trial. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed, vacated, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                                    JUDGE
Gene A. Zmuda, J.

                                              _____
Charles E. Sulek, P.J.                                             JUDGE
CONCUR.

                                              _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.